# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PEOPLE FOR THE ETHICAL TREATMENT )
OF ANIMALS, )
)
          Plaintiff, )
)  Civ. Action No. 06-930 (RMC)
v. )
)
UNITED STATES DEPARTMENT OF )
AGRICULTURE, )
)
          Defendant. )
)

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff hereby moves for summary judgment. For the reasons set forth in the accompanying memorandum, there are no genuine issues of material fact in dispute and plaintiff is entitled to judgment as a matter of law. In support of this motion, plaintiff submits the accompanying memorandum of law, a statement of material facts as to which there is no genuine issue, Exhibits 1-60 and accompanying attachments, and a proposed order.

Respectfully submitted,

      /s/   Erin M. Tobin
Erin M. Tobin
(D.C. Bar No. 494948)
Katherine A. Meyer
(D.C. Bar No. 244301)
Meyer Glitzenstein & Crystal
1601 Connecticut Ave. N.W. Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049 fax

Date:  December 6, 2006        Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PEOPLE FOR THE ETHICAL  TREATMENT OF ANIMALS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civ. Action No. 06-930 (RMC) |
| v. ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

ERIN M. TOBIN
D.C. Bar No. 494948
KATHERINE A. MEYER
D.C. Bar No. 244301
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, Suite 700
Washington, D.C. 20009

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      Statutory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      The Controversy Surrounding The USDA's Failure To Enforce
                Laws Requiring The Humane Treatment Of Animals. . . . . . . . . . . . . . . . . . . 3

        B.      PETA's Use Of The FOIA To Educate The Public About The USDA's
                Enforcement Of The AWA And Other Laws Enacted To Protect Animals. . . . . . 5

                1.      The Siegfried & Roy Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                2.      Culpepper & Merriweather Circus' Treatment Of Elephants . . . . . . . . . . 9

                3.      Illegal Animal Testing By Le Mas . . . . . . . . . . . . . . . . . . . . . . . . 12

                4.      Agriprocessors' Inhumane Slaughter Methods . . . . . . . . . . . . . . . . . 15

        D.      This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.      PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS
        CLAIM THAT THE USDA HAS IMPROPERLY WITHHELD INFORMATION
        UNDER FOIA EXEMPTIONS 6 AND 7(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.      Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B.      The Government Has Not Carried Its Burden To Demonstrate
                That All Withheld Information Is Exempt From Disclosure Under The FOIA. . 21

                1.      The Public Interest In A Witness's Statement Concerning The
                        Siegfried & Roy Incident Outweighs The Purported Privacy
                        Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

a.      The Privacy Interest Is Extremely Minimal.  . . . . . . . . . . . . . . . . 23

b.      The Public Interest In Disclosure Far Outweighs The
Minimal Privacy Interest At Stake.  . . . . . . . . . . . . . . . . . . . . . . . 25

c.      The USDA Has Failed To Disclose All Reasonably
Segregable Material.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2.      The Public Interest In Disclosure Of The Names Of USDA
Inspectors Who Engaged In Misconduct At The Agriprocessors
Facility Far Outweighs The Privacy Interests Of These Agency
Employees.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3.      The Public Interest in Knowing Where Le Mas Conducted Illegal
Animal Testing Outweighs Any Privacy Interests At Stake. . . . . . . . . . 33

II.     PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
CLAIM THAT THE USDA IS ENGAGED IN A PATTERN AND PRACTICE
OF WITHHOLDING STATEMENTS OF WITNESSES AND FEDERAL EMPLOYEES
IN VIOLATION OF THE FOIA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A.      The USDA Is Engaged In A Pattern And Practice Of
Withholding Statements Of Witnesses And Federal Employees
In Violation Of FOIA.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B.      The USDA's Practice of Withholding Information Under The FOIA
Harms PETA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C.      Plaintiff Has Stated A Claim For Relief Under The APA.  . . . . . . . . . . 40

D.      In the Alternative, Plaintiff Is Entitled To Discovery To Test The
Assertions Of Ms. Banks And Ms. MacNeil And To Develop A Factual
Record In The Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                 **PAGE**

Abigail Alliance for Better Access To Devt Drugs v. FDA,
     __ F.3d__, 2006 WL. 3359334 (Nov. 21, 2006) ....................................... 40

Assassination Archives & Research Ctr. v. CIA,
     334 F.3d 55 (D.C. Cir. 2003) ..................................................... 20

Association of America Physicians and Surgeons v. Clinton,
     997 F.2d 898 (D.C. Cir. 1993) .................................................... 43

Barrick Goldstrike Mines, Inc. v. Browner,
     215 F.3d 45 (D.C.Cir. 2000) ...................................................... 39

Better Government Association v. Department of State,
     780 F.2d 86 (D.C. Cir. 1986) ............................................... 3, 35, 42

Billington v. U.S. Department of Justice,
     233 F.3d 581 (D.C. Cir. 2000) .......................................... 20, 23, 25, 26, 31

Bowen v. Massachussetts,
     487 U.S. 879 (1988) ............................................................. 41

CEI Washington Bureau v. Department of Justice,
     __ F.3d __, 2006 WL. 3359322 (D.C. Cir. Nov. 21, 2006) ...................... 43, 44

Campbell v. U.S. Department of Justice,
     164 F.3d 20 (D.C. Cir. 1998) ............................................. 20, 25, 31

Canadian Javelin v. SEC,
     501 F. Supp. 898 (D.D.C. 1980) ............................................. 32, 33

Cf. Chrysler Corp. v. Brown,
     441 U.S. 281 (1979) ............................................................. 41

Citizens to Preserve Overton Park v. Volpe,
     401 U.S. 402 (1971) ............................................................. 43

Coastal States Gas Corp. v. Department of Energy,
     617 F.2d 854 (D.C. Cir. 1980) ........................................... 20, 21, 34

iii

Cohen v. EPA,
    575 F. Supp. 425 (D.D.C. 1983) ..................................................... 34

Continental Airlines, Inc. v. CAB,
    522 F.2d 107 (D.C. Cir. 1974) ..................................................... 35

Ctr. for Biological Diversity v. Guiterrez,
    451F. Supp. 2d 57 (D.D.C. 2006) ..................................................... 42

Dep't of Air Force v. Rose,
    425 U.S. 352 (1976) ..................................................... 2

Dep't of Justice v. Reporters Committee for Freedom of the Press,
    489 U.S. 749 (1989) ..................................................... 21, 26

Dep't Of Justice v. Tax Analysts,
    492 U.S. 136 (1989) ..................................................... 2, 41

FBI v. Abramson,
    456 U.S. 615 (1982) ..................................................... 2

Federal Election Com'n v. Akins,
    524 U.S. 11 (1998) ..................................................... 40

Gerber v. Norton,
    294 F.3d 173 (D.C. Cir. 2002) ..................................................... 43, 44

Halpern v. CIA,
    629 F.2d 144 (D.C. Cir. 1980) ..................................................... 20

Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.,
    912 F.2d 1525 (D.C. Cir. 1990) ..................................................... 39

Iglesias v. CIA,
    525 F. Supp. 547 (D.D.C. 1981) ..................................................... 32, 33

Iowa Citizens for Commty. Improvement v. U.S. Dep't of Agriculture,
    256 F. Supp. 2d 946 (S.D. Iowa 2002) ..................................................... 32

John Doe Agency v. John Doe Corp.,
    493 U.S. 146 (1989) ..................................................... 2

Kimberlin v. Dep't of Justice,
    139 F.3d 944 (D.C. Cir. 1998) ..................................................... 28

King v. U.S. Dep't of Justice,
    830 F.2d 210 (D.C. Cir. 1987) ........................................................................ 20, 25, 26

Lesar v. U.S. Department of Justice,
    636 F.2d 472 (D.C. Cir. 1980) .............................................................................. 30, 32

Lissner v. U.S. Customs Serv.,
    241 F.3d 1220 (9th Cir. 2001) ................................................................................... 30

Mead Data Central, Inc. v. U.S. Department of Air Force,
    566 F.2d 242 (D.C. Cir. 1977) ........................................................................ 20, 27, 28

Natural Resources Defense Council v. Pena,
    147 F.3d 1012 (D.C. Cir. 1998) ................................................................................. 43

National Association of Home Builders v. Norton,
    309 F.3d 26 (D.C. Cir. 2002) .................................................................................... 22

Payne Enterprises, Inc. v. United States,
    837 F.2d 486 (D.C. Cir. 1988)........................................................3, 35, 36, 37, 38,, 41, 42

Providence Journal v. Department of the Army,
    981 F.2d 552 (1st Cir. 1992) ..................................................................................... 30

Public Citizen Health Research Group v. Food & Drug Admin.,
    185 F.3d 898 (D.C. Cir. 1990) ................................................................................... 21

Ray v. U.S. Department of Justice, I.N.S.,
    770 F. Supp. 1544 (S.D. Fla.1990) ............................................................................ 38

Safecard Services, Inc. v. S.E.C.,
    926 F.2d 1197 (D.C. Cir. 1991) ................................................................................. 30

Schiller v. NLRB,
    964 F.2d 1209 (D.C. Cir. 1992) ........................................................................... 27, 33

Seminole Nation of Oklahoma v. Norton,
    223 F. Supp. 2d 122 (D.D.C. 2002) ..................................................................... 39, 40

Sierra Club v. DOI,
    384 F. Supp. 2d 1 (D.D.C. 2004) ............................................................................... 42

Steinberg v. U.S. Department of Justice,
    179 F.R.D. 366 (D.D.C. 1998) .................................................................................. 24

Stern v. F.B.I.,
    737 F.2d 84 (D.C. Cir. 1984) ............................................................ 30, 32, 33

Swan View Coalition v. Department of Agriculture,
    39 F. Supp. 2d 42 (D.D.C. 1999) ............................................................ 42, 43

Tax Analyst v. IRS,
    117 F.3d 607 (D.C. Cir. 1997) ............................................................ 41

The Nation Magazine v. U.S. Customs Serv.,
    71 F.3d 885 (D.C. Cir. 1995) ............................................................ 21

United States Dep't of State v. Ray,
    502 U.S. 164 (1991) ............................................................ 20, 22, 26

Venetian Casino Resort, L.L.C. v. E.E.O.C.,
    409 F.3d 359 (D.C. Cir. 2005) ............................................................ 42

Washington Post Co. v. U.S. Dep't of Agriculture,
    943 F. Supp. 31, 36 (D.D.C. 1996) ............................................................ 32, 34

Washington Post Co. v. U.S. Dep't of Justice,
    863 F.2d 96 (D.C. Cir. 1988) ............................................................ 22, 27, 34

Washington Post Co. v. U.S. Dep't of Health and Human Services,
    690 F.2d 252 (D.C. Cir. 1982) ............................................................ 20, 22, 25, 26, 31

## FEDERAL STATUTES

5 U.S.C. § 703 ............................................................ 40

5 U.S.C. § 706(2) ............................................................ 3, 43

5 U.S.C. § 551 et seq ............................................................ 1

5 U.S.C. § 552 ............................................................ passim

7 U.S.C. § 1902 ............................................................ 15

7 U.S.C. § 2131 ............................................................ 1, 3

7 U.S.C. § 2136 ............................................................ 13

7 U.S.C. § 2145(b) ............................................................ 34

7 U.S.C. § 2146 ................................................................................................ 3

18 U.S.C. § 201(b)(2) ...................................................................................... 16

9 C.F.R. § 2.131(c) ....................................................................................... 6, 8

9 C.F.R. § 2.40 ............................................................................................... 10

9 C.F.R. § 313.50 ........................................................................................... 15

Fed. R. Civ. P. 56(f) ......................................................................................... 2

## INTRODUCTION

In this case, plaintiff People for the Ethical Treatment of Animals ("PETA") seeks to compel under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the disclosure of information withheld by the United States Department of Agriculture ("USDA") concerning four closed investigations of animal abuse. Plaintiff is a frequent requester of information concerning the USDA's enforcement of the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131, et seq., and other laws requiring the humane treatment of animals, and seeks this information to educate the public about the USDA's failure to enforce those laws – a conclusion that was reached by the USDA's own Office of Inspector General. See U.S. Department of Agriculture, Office of Inspector General, Audit Report, APHIS Animal Care Program, Inspection and Enforcement Activities (Sept. 2005) (Exh. 1).

Plaintiff also challenges under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., the USDA's new practice of refusing to disclose entire witness statements and affidavits that the agency obtains from individuals during its investigations, without any basis under the law. Thus, for years, the USDA routinely released to PETA witness statements and affidavits included in its investigatory files. However, in 2005, for the first time in decades the USDA began withholding such records from PETA in full, requiring PETA to bring a lawsuit to dislodge this information. The USDA's new policy of refusing to release all such information even though plaintiff is entitled to it under the FOIA severely impedes PETA's ability to monitor the enforcement activities of the USDA and pursue its central objective of ensuring the humane treatment of animals.

As demonstrated below, the USDA has not carried its burden to demonstrate that all of the material the agency is withholding is lawfully exempt from disclosure, or that defendant has complied with its duty under the FOIA to segregate and release all non-exempt portions of the

documents.  In addition, plaintiff has stated a claim challenging what is clearly a new pattern and practice by the USDA of withholding such witness statements and affidavits in their entirety. Accordingly, plaintiff asks the Court to grant plaintiff's Motion for Summary Judgment and deny defendant's Motion to Dismiss, or Alternatively, for Summary Judgment.  In the alternative, plaintiff should be permitted to take discovery to test the government's generic assertions with respect to its exemption claims and its contention that it does not have a new practice of withholding material under the FOIA.  See Fed. R. Civ. P. 56(f).

## BACKGROUND

**I.    Statutory Framework**

The Freedom of Information Act provides the public a right of access to government documents, unless they are exempt under one of nine exemptions.  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989).  As consistently stated by the Supreme Court, Congress enacted the FOIA to "establish a general philosophy of full agency disclosure," which Congress believed, "put into practice, would help ensure an informed citizenry, vital to the functioning of a democratic society."  Dep't. Of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989) (internal citations omitted).

All of the FOIA's exemptions "must be narrowly construed," FBI v. Abramson, 456 U.S. 615, 636 (1982) (quoting Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976)); Tax Analysts, 492 U.S. at 151, and the Act requires that, even when there is some exempt material in a record, agencies must nevertheless disclose all segregable non-exempt material.  5 U.S.C. § 552(b).  When the government fails to carry its evidentiary burden under the statute, the FOIA vests district courts with jurisdiction to "enjoin the agency from withholding agency records" and to "order the production of any agency records improperly withheld."  5 U.S.C. § 552(a)(4)(B).

It is also well-established that FOIA requesters challenging an agency's practice for processing FOIA requests may seek relief under the APA, which authorizes courts to "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2). See Payne Enterprises, Inc. v. United States, 837 F.2d 486, 494 (D.C. Cir. 1988) ("FOIA imposes no limits on courts' equitable powers in enforcing its terms") (internal citation omitted); Better Gov't Ass'n v. Dep't of State, 780 F.2d 86, 93 (D.C. Cir. 1986) (permitting APA review of FOIA guidelines).

II.    **Facts**

    A.    **The Controversy Surrounding The USDA's Failure To Enforce Laws Requiring The Humane Treatment Of Animals.**

Congress vested the USDA with authority to enforce the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 et seq., and other laws requiring the humane treatment of animals. See, e.g., 7 U.S.C. § 2146. As adopted in 1966 and amended in 1970, 1976, and 1985, the purpose of the AWA is to "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1). The Act directs the Secretary of Agriculture ("Secretary") to "make such investigations as the Secretary deems necessary to determine whether any dealer, exhibitor, intermediate handler, carrier, research facility . . . has violated or is violating any provision of this section;" and also authorizes the Secretary to "prosecute any inquiry necessary to his duties under this Act in any part of the United States." 7 U.S.C. § 2146.

However, since passage of the AWA, the USDA's complete lack of enforcement of the Animal Welfare Act has been a matter of considerable concern to the public, as reflected in numerous newspaper and scholarly articles that have been published over the years. See, e.g., Steve

Neavling, <u>Agency faulted for not cracking down on violators</u>, FREE PRESS, July 12, 2006 (Exh. 2) ("USDA's inaction . . . highlighted complaints from within the USDA's ranks that the agency is simply not enforcing the Animal Welfare Act"); Sally Kestin, <u>Regulatory System Misses Many Problems</u>, SOUTH FLORIDA SUN-SENTINEL May 23, 2004 at 1A (Exh. 3) (reporting view of Congressperson that the USDA's "lack of follow through is unacceptable"); Robert J. Masonis, <u>The Improved Standards For Laboratory Animals Act And The Proposed Regulations: A Glimmer Of Hope In The Battle Against Animal Research</u>, 16 B.C. ENVTL. AFF. L. REV. 149, 150 (1988) ("The scarcity of federal case law addressing the use of laboratory animals in medical research under AWA's provisions does not reflect accurately the intensity of controversy surrounding both the Act's substance and the United States Department of Agriculture's (USDA) enforcement of AWA's provisions."); <u>see</u> <u>also</u> <u>id.</u> at 150 n.6 (citing numerous journal articles criticizing the USDA's enforcement of the AWA).

A 1985 General Accounting Office Report also reported significant problems with the agency's investigations and enforcement under the AWA, including the fact that Animal and Plant Health Inspection Service ("APHIS") inspectors spent a minimal amount of time conducting AWA inspections and that training of APHIS inspectors was "inadequate." U.S. GAO, Report to the Chairman, Subcommittee on Agriculture, Rural Development and Related Agencies Committee on Appropriations, United States Senate, <u>The Department of Agriculture's Animal Welfare Program</u> ii, 7 (May 16, 1985) (Exh. 4).

More recently, a September 2005 Report by the USDA's own Office of Inspector General found that the Eastern Region of APHIS' Animal Care Division is not "aggressively pursuing enforcement actions against violators of the AWA;" that, as a matter of agency policy, APHIS

"offers a 75-percent discount on stipulated fines as an incentive for violators to settle out of court," and, "as a result, violators consider the monetary stipulation as a normal cost of conducting business rather than a deterrent for violating the law."  2005 OIG Audit i-ii (Exh. 1).

> **B.    PETA's Use Of The FOIA To Educate The Public About The USDA's Enforcement Of The AWA And Other Laws Enacted To Protect Animals.**

The USDA's systemic failure to investigate and enforce the AWA and other laws for the protection of animals has led animal protection groups, such as PETA, to be actively involved in bringing to the attention of the USDA practices that violate the AWA; to monitor and publicize the USDA's enforcement efforts, and lack thereof; and to advocate for stronger protections for animals. Declaration of Lori Kettler ("Kettler Decl.") ¶ 3 (Exh. 5).  To pursue these objectives, PETA relies heavily on its receipt of information from the USDA under the FOIA – indeed, over the years it has requested from the USDA more than a dozen investigation reports.  Id. ¶ 4.

The USDA's investigation reports and the statements that non-federal witnesses, federal inspectors, and investigators provide to the USDA during the course of an investigation provide critical information that PETA needs to pursue its efforts to advocate for the protection of animals and monitor whether the USDA is performing its statutory obligations in this regard.  Id. ¶ 5.  Until recently, the USDA routinely released such records to PETA – except for the names and other personal information concerning private citizens – which typically contain the most detailed accounts of the facts of a particular investigation and, hence, the severity of violations of law that may have been committed.  Id. ¶¶ 5, 6, 7.  However, although PETA routinely received such statements from the USDA in response to FOIA requests, suddenly, beginning in 2005, the USDA began withholding such records in their entirety.  Id. ¶¶ 9, 12.  Indeed, as described in more detail

below, in the course of seeking investigatory material from separate components of the USDA,

including APHIS and the USDA's Office of Inspector General, beginning in 2005 this material was

abruptly and routinely withheld from plaintiff, regardless of which component processed plaintiff's

FOIA request.  Id. ¶¶ 18-21.  In fact, it was not until PETA filed this case and challenged the

agency's new practice that the USDA capitulated and disclosed the witness statements and

affidavits, redacting the names and personal identifying information of witnesses.  Id. ¶ 24.

### 1.    The Siegfried & Roy Incident

AWA regulations provide that "[d]uring public exhibition, any animal must be handled so

there is minimal risk of harm to the animal and the public, with sufficient distance and/or barriers

between the animal and the general viewing public so as to assure the safety of animals and the

public."  9 C.F.R. § 2.131(c).  The regulations further provide that "[d]uring public exhibition,

dangerous animals such as lions, tigers . . . must be under the direct control and supervision of a

knowledgeable and experienced animal handler."  9 C.F.R. § 2.131(d)(3).

On June 28, 2005, plaintiff submitted a FOIA request to APHIS seeking the USDA's

investigation report concerning the mauling of Roy Horn by one of the white tigers routinely

exhibited by Mr. Horn in the Las Vegas performance, "Siegfried and Roy."  Letter from Lisa

Wathne to Lesia Banks (June 28, 2005) (Exh. 6).  This incident, in which the tiger purportedly and

with no provocation attacked Mr. Horn onstage during a nightclub performance, has been the

subject of much public attention and debate – including whether it is safe and appropriate to exhibit

exotic animals purely for entertainment purposes.  See, e.g., Tiger beat: Siegfried & Roy Tragedy

puts big cats in center stage - News Debate, Nov. 7, 2003 (Exh. 7) ("The tragedy cast a spotlight

on a heated debate: Do tigers have any place in live shows?"); Vegas Tiger Attack Inevitable?, CBS

News, Oct. 6, 2003 (Exh. 8) ("With a wild animal, it's never tamed, it's never trained, it's never domesticated");  J. Michael Kennedy, <u>Senate passes big-cat bill</u>, LOS ANGELES TIMES, Nov. 18, 2003 (Exh. 9) (reporting on U.S. Senate bill to regulate trade in big cats in response to " the mauling of tiger trainer and illusionist Roy Horn"); Brian T. Murray, <u>AR-News: (NJ) Attack shines light on use of wild animals</u>, STAR LEDGER, Oct. 9, 2003 (Exh. 10) ("a national debate continued over the private ownership of exotic animals"); <u>Wild animal ban right step for state</u>, SEATTLE POST-INTELLIGENCER, Feb. 12, 2004 (Exh. 11) ("tigers and bears mix poorly, even dangerously with people. The Legislature should . . . ban ownership of many wild animals.").

Many individuals, including audience members, employees of Siegfried & Roy, and those knowledgeable about exotic animals, provided information as to the cause of this event and whether this and similar animal attacks could have been prevented.  <u>See</u>, <u>e.g.</u> <u>Transcript CNN Larry King Live</u>, (CNN television broadcast Oct. 6, 2003) ("Larry King Transcript") (Exh. 12) (roundtable of speakers discussing the attack, including an audience member, Siegfried & Roy employee, and Jack Hanna); <u>Siegfried and Roy: Stage Fright</u>, READERS DIGEST, April 2004 (Exh. 13) (information was provided by witnesses and crew).

The Siegfried & Roy incident thus raised questions as to why the USDA had not exercised its authority to prevent this tragic event and to ensure that the wild animals exhibited in he act did not pose a risk to members of the audience when it had inspected the facility on <u>numerous</u> occasions, and, thus, was aware of the fact that there was no barrier between the tiger and the public.  <u>See</u>, <u>e.g.</u>, <u>Roy Horn Tiger Mauling Case Closed</u>, CBS NEWS, June 28, 2005 ("Case Closed") (Exh. 14) ("It is not clear why the USDA did not advise the company earlier about erecting a barrier.  The agency conducted at least four routine inspections at the Mirage since mid-

December"); see also 9 C.F.R. § 2.131(c)(1). The USDA's investigation of the event also became a matter of interest and public debate, even drawing close scrutiny from members of Congress who, at one point, threatened to intervene in the investigation. National Briefing, West: Nevada: Officials To View Tiger Attack Tape NEW YORK TIMES, Sept. 15, 2004 ("National Briefing") (Exh.15); Horn Attack Video Quest Quashed, ASSOCIATED PRESS, Sept. 15, 2004 (Exh. 16).

On July 14, 2005, after APHIS closed its investigation, APHIS released portions of the final investigation report to PETA. Letter from Lesia Banks to Lisa Wathne (July 14, 2005) (Exh. 17); Kettler Decl. ¶ 19. The USDA's final report concluded that Siegfried & Roy had violated AWA regulations by failing to provide a barrier between the audience and the stage where the tiger performed, and by not having adequate control of the tiger during the performance. See Excerpt, U.S. Department of Agriculture, Animal Plant Heath Inspection Service, Report of Investigation 3 (Sept. 28, 2004) (Exh. 18); see also 9 C.F.R. § 2.131. However, as frequently happens, the USDA did not sanction the company. See Case Closed, supra (Exh. 14).

However, for the first time in the many years that PETA has been requesting investigatory material from the USDA, APHIS withheld in their entirety three supporting affidavits that the USDA obtained from witnesses, including an affidavit from a witness to the attack, an affidavit form a USDA veterinarian, and an affidavit from the Deputy Administrator of the Animal Care Division. July 14, 2005 Banks Letter, supra (Exh. 17); see also Letter from Lori Kettler to Administrator (Sept. 7, 2005) (Exh. 19). The USDA also withheld in its entirety an audio-recording of a witness's telephone call to the USDA. Sept. 7, 2005 Kettler Letter, supra (Exh. 19). The agency asserted that the affidavits could be withheld in their entirety under FOIA Exemptions 6 and 7(C). Id.

On September 7, 2005, plaintiff appealed APHIS' denial of its FOIA request.  Id.  PETA explained that there was a tremendous public interest in all of the information concerning this high-profile investigation.  Id.  Plaintiff further explained that withholding the witness statements was not necessary to protect any potential privacy interests at stake, since any personal information about the affiants could simply be redacted, and the remainder of the information could be released. Id.

Having received no response from the USDA, on May 17, 2006 plaintiff filed this case challenging the agency's withholdings, except for the withholding of names and other personal identifying information concerning private individuals.  Plaintiff's First Amended Complaint ("Complaint") ¶ 1.  Two months later, on July 17, 2006 – in an about face – the USDA released the written affidavits and withheld the names and personal identifying information of private citizens and federal employees.  See Letter from Ron De Haven to Lori Kettler (undated) (Exh. 20).  One of those affidavits from the Assistant Deputy Administrator of the USDA's Animal Care Division revealed that, prior to the attack, the USDA in fact was aware that seats for the public were within four feet of the area in which the tigers walked on the stage.  Affidavit of Richard H. Watkins (Jan. 22, 2004) (Exh. 21).  However, the agency continued to withhold the recorded witness statement in its entirety under Exemptions 6 and 7(C).  De Haven Letter, supra (Exh. 20).

## 2.    **Culpepper & Merriweather Circus' Treatment Of Elephants**

USDA regulations provide that exhibitions of animals "must maintain programs of adequate veterinary care that include [t]he use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries . . . daily observation of all animals to assess their well-being [and] adequate guidance to personnel involved in the care and use of animals . . ."  9 C.F.R. § 2.40.

-9-

In February 2004, two African elephants in the custody of the Culpepper & Merriweather Circus, named Connie and Barbara, died suddenly within weeks of each other, and with no cause given by the circus. Excerpt, U.S. Department of Agriculture, Animal & Plant Health Inspection Service, Report of Investigation (Feb. 14, 2005) (Exh. 22). However, on numerous prior occasions, Culpepper & Merriweather had been cited by the USDA for its failure to provide adequate veterinary care to the elephants and for violations of other requirements of the AWA. See, e.g., Bryan Clapper, Elephants vanish before main circus show, July 29, 2004 (Exh. 23); PETA Fact Sheet: Culpepper & Merriweather Circus (June 5, 2006) (listing history of Culpepper & Merriweather Circus AWA violations) (Exh. 24); Jeremy Berzon, 2 Elephants Are Scratched From Billing: A Circus Sends its Big Stars to Arizona for Behavior Training After They Got Loose In Yucca Valley THE PRESS-ENTERPRISE, April 22, 2000 at B01 (Exh. 25) ("circus employee trying to get the elephant back under control was trampled").

In light of this history of violations, on approximately June 18, 2004, plaintiff asked the USDA to investigate the cause of Connie and Barbara's deaths. See USDA, APHIS, Animal Care, Animal Welfare Act Complaint (June 23, 2006) (Exh. 26). After over a year passed and the agency did not institute any enforcement action against Culpepper & Merriweather, in an effort to uncover exactly what happened to the elephants and whether the USDA had issued any sanctions against the company, plaintiff submitted a FOIA request seeking records related to the investigation. See Letter from Hanna Schein to Lesia Banks (April 6, 2005) (Exh. 27); see also Kettler Decl. ¶ 4.

On December 6, 2005, after closing the investigation, APHIS released the investigation report to PETA. Letter from Lesia Banks to Hannah Schein (Dec. 6, 2005) (Exh. 28). APHIS concluded in that report that the circus had violated AWA regulations by exhibiting animals at an

unlicenced facility and by failing to notify the USDA of a change of address.  Culpepper & Merriweather Report 3-4(Exh. 22). However, despite the unexplained deaths of these two animals, and the concern expressed by at least one APHIS official "about whether there was adequate veterinary care" provided to the elephants, see Email from Denise M. Sofranko to Ray Flynn (March 5, 2004) (Exh. 29), the USDA did not find any violations of law, or impose any penalty on the company, in relation to the elephants' deaths.  Culpepper & Merriweather Report 3-4 (Exh. 22).

However, pursuant to its new practice, APHIS withheld from plaintiff all ten of the affidavits attached to the investigation report, obtained from witnesses, inspectors, and investigators, on the grounds that these records were exempt from disclosure in their entirety under Exemptions 6 and 7(C) of the FOIA.  Dec. 6, 2005 Banks Letter (Exh. 28); Kettler Decl. ¶ 18.  However, since these affidavits contained most of the substantive information in APHIS' investigation report, release of the report in its redacted form revealed little about what happened to Connie and Barbara and whether the agency had agreed to settle the case.  Kettler Decl. ¶ 18.

On January 18, 2006, plaintiff appealed the denial of its FOIA request.  Letter from Lori Kettler to Administrator (Jan. 18, 2006) (Exh. 30).  Although PETA agreed that the names and personal identifying information of private individuals could be withheld, it challenged APHIS' decision to withhold the remainder of the affidavits.  Id.  Plaintiff also challenged APHIS' failure to produce "all agency records" related to the investigation, as requested by plaintiff in its FOIA request, since APHIS only produced a copy of the record of PETA's complaint and the agency's investigation report.  Id.  Thus, the USDA did not release numerous other records related to the event, such as veterinary records for the animals and records revealing whether the USDA imposed any fines on the company.

On July 17, 2006, after plaintiff was forced to file this lawsuit, the USDA released the witness statements to plaintiff except for the names and identifying information of private citizens and federal employees.  Letter from Ron DeHaven to Lori Kettler (Exh. 31).  The released information revealed that at least one USDA inspector was aware that one of the elephants had died unexpectedly, and that another elephant was at the facility, but did not take steps to protect the other elephant from a similar fate.  See Affidavit (Sept. 2, 2004) (Exh. 32).

Additional material received after plaintiff filed suit revealed that the agency had settled the matter with the company for only $ 500, for the company's failure to notify the USDA of a change of address.  See Letter to USDA, APHIS (April 21, 2005) (Exh. 33).

### 3.    Illegal Animal Testing By Le Mas

The AWA provides that animals intended for use in research must be provided "humane care and treatment," that entities wishing to conduct research on animals must apply for and obtain a license to do so, and that "[e]very research facility . . . not licensed [under the Act] shall register with the Secretary" in accordance with USDA rules and regulations.  7 U.S.C. §§ 2131, 2136.

In September 2004, PETA filed a complaint requesting that the USDA investigate an ammunitions company, Law Enforcement Military Ammunition Sales ("Le Mas"), because a promotional video distributed by the company depicted employees killing and maiming hogs to demonstrate the efficacy of the company's bullets for U.S. military and law enforcement agencies. Letter from Lori Kettler to Robert Gibbens (September 20, 2004) (Exh. 34).  According to PETA's complaint, the company violated the AWA by failing to minimize the animals' suffering and by engaging in military "research," when the company was neither licensed by, nor registered with, the USDA for this purpose.  Id.

Indeed, for years, the issue of inhumane military animal testing has been a controversial issue. See Bryn Nelson, Science At A Price, NEWSDAY, Sept. 27, 2004 (Exh. 35) (since the AWA was passed, "questions have been brewing, not only of how research should be conducted, but also of whether some should be conducted at all"); see also, e.g.,Suzanne E. Roy, Mauled by '60 Minutes' - January 24, 1993 Misleading "Animal Rights' Segment (Exh. 36) (discussing controversial military study in which scientists shot cats to study brain functions). Such concerns go to the heart of why Congress enacted the Animal Welfare Act – i.e., to "insure that certain animals intended for use in research facilities are provided humane care and treatment." Laboratory Animal Welfare Act of 1966, Pub. L. No. 89-544, 80 Stat. 350 (1966) (emphasis added). Thus, PETA's complaint explained that Le Mas violated the AWA's fundamental requirement that facilities seeking to engage in research involving animals must either obtain a license from or register with the USDA under the Act. See 7 U.S.C. § 2136; Sept. 20, 2004 Kettler Letter (Exh. 34).

After almost a year with no apparent action by the USDA, on August 15, 2005, plaintiff submitted a FOIA request seeking a copy of the investigation report for this incident. Letter from Lori Kettler to Andrea Fowler (Aug. 15, 2006) (Exh. 37). After the USDA closed the investigation, APHIS released to PETA portions of its final report. Letter from Lesia Banks to Lori Kettler (Jan. 12, 2006) (Exh. 38). In addition, a settlement agreement between APHIS and Le Mas revealed that the company had violated eight AWA regulations in connection with these activities – including by "physically abus[ing] hogs while conducting research," and by failing to "comply with the regulations in the humane handling, care and treatment of animals." USDA, Investigative and Enforcement Services, Settlement Agreement (undated) (Exh. 39). Nevertheless, the USDA offered to settle the entire case if Le Mas paid a penalty of only $ 2,750. Id. Moreover, pursuant to its new

-13-

practice, APHIS again withheld from PETA two affidavits of USDA investigators, claiming that these records were exempt under FOIA Exemptions 6 and 7(C).  Kettler Decl. ¶ 20; see also Letter from Lesia Banks to Lori Kettler (Jan. 12, 2006).

Concerned that the USDA's extremely minimal penalty would not deter future abuse of the animals at this facility, plaintiff attempted to uncover where the events depicted on the video had occurred, so that it could inform local law enforcement of the abuse and urge those officials to take appropriate action under the applicable state anti-cruelty laws.  Kettler Decl. ¶ 11.  After PETA contacted prosecutors, requested that these officials institute their own investigations of the acts, id, the company stated that the events took place in Arkansas, see PETA: Bullet maker tested ammo on pigs THE SEATTLE TIMES, March 3, 2006 (Exh. 40).  Without any official acknowledgment of this fact by the USDA, PETA was unable to confirm the location.  However, this effort was seriously thwarted by the USDA's withholding of the two affidavits. Id.

As a result, on February 16, 2006, PETA appealed the USDA's withholding of the investigators' affidavits in their entirety, explaining that the significant public interest in uncovering all of the basic facts related to the USDA's investigation of Le Mas far outweighed any potential privacy interests involved, especially since all of the non-personal factual information that must be contained in the statements could be segregated and released without causing an "unwarranted invasion of personal privacy interests" under either Exemptions 6 or 7(C) of the FOIA.  Letter from Lori Kettler to Administrator (Feb. 16, 2006) (Exh. 41).

On July 17, 2006, again only after this lawsuit was filed, the USDA released the bulk of the substantive information from the two affidavits.  Declaration of Lesia Banks ("Banks Decl.") ¶ 13.  However, among other redactions, the USDA continued to withhold the location of the shootings

portrayed in Le Mas' promotional video.  Affidavit (Feb. 25, 2005) (Exh. 42); Affidavit (Feb. 25, 2005) (Exh. 43).

####    4.    Agriprocessors' Inhumane Slaughter Methods

The HSA – another statute under the USDA's jurisdiction – provides that "[n]o method of slaughtering or handling in connection with slaughtering shall be deemed to comply with the public policy of the United States unless it is humane."  7 U.S.C. § 1902.  The HSA provides that practices are "humane" if animals are either "rendered insensible to pain by a single blow or gunshot or an electrical, chemical or other means that is rapid and effective, before being shackled, hoisted, thrown, cast, or cut" or slaughtered "in accordance with the ritual requirements of the Jewish faith or any other religious faith that prescribes a method of slaughter whereby the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument and handling in connection with such slaughtering."  Id.

HSA regulations further provide that "[w]hen an inspector observes an incident of inhumane slaughter . . . he/she shall inform the establishment operator of the incident and request that the operator take the necessary steps to prevent a recurrence."  9 C.F.R. § 313.50.  In addition, under policies implementing the HSA, "[i]nspection program personnel are to verify that after the ritual slaughter cut and any additional cut to facilitate bleeding, no dressing procedure (e.g. head skinning, leg removal, ear removal, horn removal, opening hide patterns) is performed until the animal is insensible."  Food Safety Inspection Service Directive 6900.2 (Nov. 25, 2003) (Exh. 44) at 7. If inspectors have "concerns while verifying" compliance with these requirements, "they are to call the [designated officer] through supervisory channels" and "document the noncompliance."  Id. at 8.

Furthermore, it is a violation of federal law if a "public official . . directly or indirectly,

corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for . . . being induced to do or omit to do any act in violation of the official duty of such official or person."  18 U.S.C. § 201(b)(2).

In November 2004, PETA released to the public video footage showing the routine and gruesome slaughter procedures employed at Agriprocessors, the largest certified kosher slaughter facility in the world.  See Aaron Gross, When Kosher Isn't Kosher, TIKKUN MAGAZINE, March/April 2005, Vol. 20, No. 2 (Exh. 45).  The video shows fully conscious cattle having their trachea and esophagi ripped out, despite the presence of ten USDA inspectors on-site who apparently did nothing to stop these practices.  Gross, supra (Exh. 45).  The video generated a great deal of public debate, as many questioned whether such practices were, in fact, "kosher," and, if so, whether they could possibly be humane under the HSA.  See, e.g., Donald G. McNeil Jr., Inquiry Finds Lax Federal Inspections at Kosher Meat Plant, N.Y. TIMES, March 10, 2006 (Exh. 46) ("The scene caused a furor among Jewish communities around the world"); Adam Frank, The First Word: When 'kosher' slaughter is not Jewish JERUSALEM POST, March 30, 2006 (Exh. 47) ("This horrible act, which has now been declared in violation of US animal cruelty laws, is not a necessary part of the shehita process"); Gross, supra (Exh. 45) ("at stake" in the controversy is the "basis of Jewish dietary law").

In response to this public outcry, the USDA Office of Inspector General ("OIG") launched an investigation into whether Agriprocessors violated the HSA by engaging in the slaughter procedures documented by PETA's video.  Excerpt, U.S. Department of Agriculture, Office of Inspector General - Investigations, Report of Investigation (April 25, 2005) (Exh. 48).

To further inform the ongoing debate concerning the company's activities, and to uncover the extent of the legal violations involved and whether the USDA had imposed any sanctions on the

-16-

company or the USDA inspectors, on October 26, 2005, PETA submitted a FOIA request to the USDA's Office of Inspector General seeking a copy of the agency's final report of investigation. Kettler Decl. ¶ 4; see also Email from Lori Kettler to Ms. MacNeal (Oct. 26, 2005) (Exh. 49).

On February 28, 2006, once it had completed its investigation, the OIG released its final investigation report. Letter from Deirdre MacNeil to Lori Kettler (Feb. 28, 2006) (Exh. 50); see also MacNeil Decl. ¶ 23. OIG concluded that Agriprocessor employees engaged in "acts of inhumane techniques" by "dressing" animals, i.e., pulling out the animals' trachea and esophagi, before the animals were "unconscious," and therefore insensible to pain. Agriprocessors Report, supra (Exh. 48) at 2 . The OIG also found that "[USDA] employees observed the acts of inhumane slaughter and did nothing to stop the practice." Id. (emphasis added). It further found that "[USDA] inspectors accepted meat products from [Agriprocessors] employees . . . and engaged in other acts of misconduct." Id. (emphasis added).

According to news reports, however, OIG did not take any legal action whatsoever against the slaughter facility. Orlan Love, Meat Plant Violated Cruelty Laws THE GAZETTE, March 11, 2006 (Exh. 51). Further, the OIG imposed extremely minor sanctions on only three of the ten federal inspectors who were all working on-site at the plant at the time of these activities, suspending one inspector for fourteen days and only issuing warning letters to two others. See McNeil, supra (Exh. 46). Members of the public questioned whether these penalties were sufficient in light of the serious evidence of employee misconduct. See, e.g., Love, supra (Exh. 51); Christopher Doering, USDA Finds Misconduct by Inspectors in Kosher Plant REUTERS (Exh. 52).

The public's ability to scrutinize the activities of the federal employees under investigation was thwarted, however, because OIG withheld from PETA substantial information contained in the

investigation report, including five sworn statements and eight memoranda of interviews obtained

from Agriprocessor employees, USDA inspectors, and USDA investigators.  See MacNeil letter,

supra (Exh. 46); see also Agriprocessors Report 13 (Exh. 48).  In keeping with the practice employed

by other components of the USDA, OIG redacted all of the information contained in these statements

on the ground that every word could be withheld on privacy grounds – albeit the OIG cited the

Privacy Act instead of the FOIA.  MacNeil Decl. ¶ 23

On March 24, 2006, PETA appealed the USDA's denial of its FOIA request, explaining that

agencies may not legally withhold information that is requested under the FOIA based on the Privacy

Act, but instead must demonstrate that such information is exempt from disclosure under the FOIA.

Letter from Lori Kettler to Inspector General (March 24, 2006) (Exh. 53).  However, once again,

only after plaintiff filed this lawsuit did the USDA release the statements, without the names and

personal identifying information of private citizens and federal employees.  Kettler Decl. ¶ 23.  The

released information revealed, in graphic detail, that a USDA inspector witnessed Agriprocessor

employees "skinning heads" of cattle while the animals appeared to be conscious, and that the same

inspector also witnessed animals still standing, after their throats had been cut.  See, e.g., Exhibit 13

to Agriprocessors Report, Sworn Statement 5 (Dec. 7, 2004) (Exh. 54).  The statements also revealed

that a Senior Veterinary Medical Officer was not trained in the requirements of religious slaughter,

and that one inspector engaged in other misconduct.  See Exhibit 6 to Agriprocessors Report,

Memorandum of Interview 3 (undated) (Exh. 55); see also Exhibit 12 to Agriprocessors Report,

Sworn Statement (Dec. 8, 2004) (Exh. 56).

However, rather than provide the public with information identifying the federal employees

who had engaged in such reprehensible behavior, the USDA redacted from the statements all

-18-

references to these federal inspectors, invoking Exemptions 6 and 7(C).   Exh. 4 to Def. Mem.

D.        This Lawsuit

Plaintiff was denied access to witness statements and affidavits with respect to all four of these matters.  Therefore, on May 17, 2006, plaintiff filed this lawsuit to obtain all of the material the USDA improperly withheld under the FOIA, with the exception of names and personal identifying information of private citizens.  (Complaint ¶ 1).  In addition, plaintiff challenged under the APA the USDA's new pattern and practice of withholding witness statements in full.  Id.

In light of the USDA's release of additional information in response to plaintiff's lawsuit, at this juncture, in addition to their APA claim, plaintiff challenges the following withholdings:  (1) a CD recording of a witness's report of information concerning the Roy Horn incident; (2) the names of federal inspectors redacted from witness statements obtained in connection with the USDA's investigation of Agriprocessors; and (3) the location where Le Mas conducted illegal animal testing.

## ARGUMENT

## I.        PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM THAT THE USDA HAS IMPROPERLY WITHHELD INFORMATION UNDER FOIA EXEMPTIONS 6 AND 7(C).

A.        Standard Of Review

A suit to compel production of records under the FOIA is reviewed by the court de novo. 5 U.S.C. § 552(a)(4)(B).  Moreover, summary judgment may only be granted to the government if "the agency proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the requester."  Friends of Blackwater v. Dep't of Interior, 391 F. Supp. 2d 115, 119 (D.D.C. 2005). Thus, the burden is on the government to justify withholding of any requested documents.  5 U.S.C.

-19-

§ 552(a)(4)(B); United States Dep't of State v. Ray, 502 U.S. 164, 173 (1991); Coastal States Gas

Corp. v. Dep't of Energy, 617 F.2d 854, 861 (D.C. Cir. 1980) ("the burden is on [the agency] to

establish [its] right to withhold information from the public"). An agency must also demonstrate that

it has disclosed all segregable non-exempt material. 5 U.S.C. § 552(b).

  In meeting its burden, the government may rely on agency declarations; however, such

declarations are only a sufficient basis for summary judgment if "they contain reasonable specificity

of detail rather than merely conclusory statements, and if they are not called into question by

contradictory evidence in the record or by evidence of agency bad faith." Halpern v. CIA, 629 F.2d

144, 148 (D.C. Cir. 1980); see also Billington v. U.S. Dep't of Justice, 233 F.3d 581, 584 (D.C. Cir.

2000) (rejecting FBI's "bald assertion" that information was received with understanding of

confidentiality) (quoting Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998));

accord King v. U.S. Dep't of Justice, 830 F.2d 210, 221-22 (D.C. Cir. 1987); Washington Post Co.

v. U.S. Dept. of Health and Human Services, 690 F.2d 252, 262 (D.C. Cir. 1982) (the government's

assertions that documents contain "'intimate details' of personal finances," without additional

information, does not satisfy government's burden of proof); Mead Data Central, Inc. v. U.S. Dept.

of Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977) ("the burden which the FOIA specifically places

on the Government to show that the information withheld is exempt from disclosure cannot be

satisfied by the sweeping and conclusory citation of an exemption . . .").

  Accordingly, since the government bears the burden of proof in this case, if the USDA fails

to justify its withholding of information under the FOIA, plaintiff is entitled to summary judgment

as a matter of law. See, e.g., Coastal States, 617 F.2d at 870 (requiring release of records because

agency "failed to carry its burden of establishing that the documents involved in this appeal were

properly withheld"); Public Citizen Health Research Group v. Food & Drug Admin., 185 F.3d 898,

905 (D.C. Cir. 1990).

### B.    The Government Has Not Carried Its Burden To Demonstrate That All Withheld Information Is Exempt From Disclosure Under The FOIA.

The government contends that Exemptions 6 and 7(C) authorize it to withhold

information in which there is a substantial public interest, as demonstrated above, supra at 6-19.

However, under exemption 7(C), the government may withhold information that is "compiled for

law enforcement purposes" only if it can demonstrate that production of such information "could

reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §

552(b)(7)(C) (emphasis added). The Supreme Court has repeatedly emphasized that, to

determine whether an agency has properly invoked this exemption, the reviewing court "must

balance the public interest in disclosure against the interest Congress intended the Exemption to

protect." Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 776

(1989); see also The Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 893 (D.C. Cir. 1995)

(Exemption 7(C) "permit[s] exemption if the privacy interest at stake outweighs the public's

interest in disclosure"). Thus, as explained by the D.C. Circuit, the "disclosures with which the

statute is concerned are those of 'an intimate personal nature' such as marital status, legitimacy

of children, identity of fathers of children, medical condition, welfare payments, alcoholic

consumption, family fights, and reputation." Washington Post Co. v. U.S. Dep't of Justice, 863

F.2d 96, 100 (D.C. Cir. 1988) (emphasis added).

Under Exemption 6, the government has an even higher burden to justify withholding

information, since the exemption applies only to material that, if disclosed, "would constitute a

clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (emphasis added); see also Ray, 502 U.S. at 172 ("the Government's burden in establishing the requisite invasion of personal privacy to support an Exemption 6 claim is heavier than the standard applicable to Exemption 7(C).") (emphasis added). Thus, as the D.C. Circuit has repeatedly held, in deciding whether information is exempt from disclosure under Exemption 6, there is a "presumption in favor of disclosure." National Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Washington Post, 690 F.2d at 261). Thus, both Exemption 7(C) and Exemption 6 require a reviewing court to "balance 'the individual's right of privacy' against the basic policy of opening 'agency action to the light of public scrutiny.'" Ray, 502 U.S. at 175 (internal citations omitted).

        **1.**      **The Public Interest In A Witness's Statement Concerning The Siegfried & Roy Incident Outweighs The Purported Privacy Interests.**

The USDA withheld under Exemptions 6 and 7(C) all of the information contained in a CD recording of an individual's telephone call to the agency providing information concerning the attack on Roy Horn by one of his tigers. Exh. 2 to Def. Mem. at 23. As demonstrated supra at 7-8, this particular incident has received significant attention from the public concerning whether exotic animals should be used for entertainment purposes, whether Siegfried & Roy was in violation of AWA regulations concerning the protection of dangerous animals from the public, and whether the incident could have been prevented by the USDA, which was well aware of this particular nightclub act. See Roy Horn Tiger Mauling Case Closed, supra (Exh. 14). Accordingly, as further detailed below, the public interest in knowing all of the facts of this high profile investigation far outweighs the privacy interests at stake, and, thus, plaintiff is entitled to obtain this information.

### a.     The Privacy Interest Is Extremely Minimal.

The government has made <u>no</u> showing that, without the witness's name, release of the recorded statement could nevertheless cause <u>any</u> invasion of personal privacy, much less one that is "clearly unwarranted."  5 U.S.C. § 552(b)(6), (7)(C).  Thus, in its <u>Vaughn</u> Index, the government summarily states that the caller "may be identified by his or her voice;" that the "informant has a privacy interest in not being associated with the investigation;" and that "[d]isclosing this CD recording <u>may</u> subject this person to substantial inquiries or harassment by the media and other interested parties."  Exh. 2 to Def. Mem. at 23 (emphasis added).

However, as a threshold matter, the USDA has not suggested that release of any of the <u>substantive</u> content of the recording could reveal the identity of the caller.  Hence, the USDA's <u>only</u> argument appears to be that, if released, someone could somehow potentially listen to the recording, recognize the voice of the caller, and associate that person with this closed investigation, and thereby potentially subject the witness to "harassment" or "substantial inquiry."  <u>Id.</u>  However, without much more demonstration as to how any of this could occur, the government simply has not met its burden of proof.  <u>See</u>, <u>e.g.</u>, <u>Billington</u>, 233 F.3d at 584 (rejecting FBI's "bald assertion" that records could be withheld under the FOIA).

Furthermore, the USDA has not even made any demonstration that the person who made the telephone call had, or continues to have, <u>any</u> expectation of privacy in not being identified as a source of information in this case.  Thus, the USDA has not indicated that this person requested that his or her identity be kept confidential, nor has the USDA even remotely suggested that this person did anything other than voluntarily provide information to the USDA concerning a matter of tremendous public concern.  Indeed, many other witnesses came forward with information

concerning this incident without requesting anonymity.  Larry King Transcript, <u>supra</u>  (Exh. 12)

(interview of audience member and Siegfried & Roy employee); <u>see</u> <u>also</u> READERS DIGEST, <u>supra</u>

(Exh. 13) (audience members and crew provided information).

Moreover, based on the few facts provided by the government in its <u>Vaughn</u> Index, it is

speculation at best to assert that, if the USDA released the recording to the public, <u>anyone</u> would be

able to recognize the caller by the sound of his or her voice.  For example, if the person on the call

was just one of the more than 1500 patrons who just happened to be in the audience that night, it is

pure hypothesis to suggest that this person could ever be recognized as a result of disclosure of this

record.  Certainly the media would have no idea who the caller might be, and thus it is extremely

unlikely that release of the CD would allow members of the media to "harass" such an individual

or subject him or her to unwanted "inquiry."  Exh. 2 to Def. Mem. at 23.  Indeed, the USDA has not

pointed to any instances in which any <u>other</u> patrons of the show that evening suffered unwanted

attention or "harassment" from the media or any other members of the public as a result of

witnessing or commenting on these events.  <u>See</u>, <u>e.g.</u>, <u>Steinberg v. U.S. Dep't of Justice</u>, 179 F.R.D.

366, 372 (D.D.C. 1998) (rejecting agency claim of protection under Exemption 7(C) because "it is

simply not credible to believe that anyone could identify the informant based on the most cursory

first impressions of an unidentified observer.").

In any event, it is the government's burden to articulate the basis for its claim that the

witness's privacy interests are actually at risk here, and conclusory, unsupported assertions, such as

those made here, are simply insufficient.  <u>See</u>, <u>e.g.</u>, <u>Washington Post Co. v. U.S. Dep't of Agriclture</u>,

690 F.2d at 262  (agency claim that record contained "'intimate details' of personal finances" did

not satisfy government's burden of proof); <u>Billington,</u> 233 F.3d at 584 (rejecting as insufficient

agency's "bald assertion" that information satisfied exemption) (citing <u>Campbell</u>, 164 F.3d at 30); <u>accord King</u>, 830 F.2d at 221-22.

> **b.    The Public Interest In Disclosure Far Outweighs The Minimal Privacy Interest At Stake.**

As demonstrated <u>supra</u> at 7-8, there is a strong public interest in all of the facts associated with the USDA's investigation of this event.  Thus, this event triggered a nationwide debate concerning the cause of this tragic event, the USDA's role in regulating this and similar facilities, and whether the entertainment industry should be permitted to exhibit exotic animals at all.  <u>See</u>, <u>e.g.</u>, <u>National Briefing</u> (Exh. 15); <u>Siegfried: Tiger wanted to help Roy</u>, CNN, October 9, 2003 (Exh. 57); <u>Doctor calls Roy's survival 'all but miraculous'</u>, REVIEW JOURNAL, October 08, 2003 (Exh. 58); <u>Roy Horn Tiger Mauling Case Closed</u>, <u>supra</u> (Exh. 14) ("It is not clear why the USDA did not advise the company earlier about erecting a barrier.  The agency conducted at least four routine inspections at the Mirage since mid-December.").

Therefore, contrary to the government's assertion, Exh. 2 to Def. Mem. at 23, release of the requested information would shed considerable light on the USDA's activities, specifically, whether in light of <u>all</u> of the facts (and not just those that the USDA has chosen to reveal) it was unreasonable for the USDA to decline to pursue any enforcement action against Siegfried & Roy – when the agency itself concluded that the company violated the AWA and its implementing regulations by failing to erect any barriers that would "protect the animals from the public or the public from the animals."  <u>See</u> Siegfried & Roy Report, <u>supra</u> (Exh. 18) at 3.

Such matters are of tremendous concern to the public.  Indeed, as demonstrated, <u>supra</u> at 4-6, the USDA's failure to enforce the AWA is a well-documented fact.  Indeed, the USDA's own Office

of Inspector General found that components of APHIS' Animal Care Division are not "aggressively pursuing enforcement actions against violators of the AWA;" and that APHIS almost always agrees to substantially reduced stipulated penalties that most known violators of the Act consider to be a "normal cost of conducting business rather than a deterrent for violating the law." 2005 OIG Audit, supra (Exh. 1). Thus, bringing to light all of the facts of specific instances in which the USDA has chosen not to enforce the AWA against a known violator of the Act, such as the information at issue here, would necessarily shed light on "what the government is up to" – the core function of the FOIA. Reporters Comm., 489 U.S. at 773; see also Ray, 502 U.S. at 178 ("the public interest in knowing whether the State Department had adequately monitored Haiti's compliance with its promise not to prosecute returnees" falls within the purpose of the FOIA).

Failing completely to recognize such valid public interests in the information, the USDA summarily asserts in its Vaughn Index that the "contents of this recording would not educate the public about the inner workings of APHIS." Exh. 2 to Def. Mem. at 23; see also Def. Mem. at 28 n.4. However, such a self-serving statement is not only contradicted by the record of this case, see supra, but it also simply does not satisfy the government's evidentiary burden. Washington Post, 690 F.2d at 262; Billington, 233 F.3d at 584; King, 830 F.2d at 219.

Accordingly, because the public interest in this record clearly outweighs the non-existent privacy interest at stake, the information must be disclosed. See Washington Post, 690 F.2d at 262. (disclosure of report required because agency failed to show any risk to privacy interests).

### c.    The USDA Has Failed To Disclose All Reasonably Segregable Material.

At a bare minimum, the USDA must release "[a]ny reasonably segregable portion of a record

. . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). As the D.C. Circuit has repeatedly emphasized, it has "long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Schiller v. NLRB, 964 F.2d 1205, 1209 (D.C. Cir. 1992) (quoting Mead Data Central, Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (1977)). Furthermore, "unless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." Mead Data 566 F.2d at 261.

Here, however, the USDA has withheld the entire CD recording on the ground that release of the CD would constitute an unwarranted invasion of personal privacy of the caller. Exh. 2 to Def. Mem. at 23. Thus, the only argument the USDA appears to make as to segregability is that simply hearing the caller's voice will necessarily cause an unwarranted invasion of personal privacy by revealing the caller's identity. Id. However, as demonstrated supra 24-6, the agency has failed to provide any basis whatsoever for this contention.

Moreover, even assuming that the agency could provide additional information that would somehow substantiate this assertion, it has failed to explain why it could not nevertheless edit the recording in a way that would not reveal the caller's identity – i.e., by altering the sound or speed of the recording – as the agency sometimes does when it releases video tapes under the FOIA to protect the identities of particular individuals. See, e.g., Letter from USDA (March 27, 2002) (Exh. 59) (explaining that the agency would have to "edit" videotapes requested under the FOIA to protect the

privacy of individuals shown on the tapes).[1]

The USDA's only reference to whether it segregated and released all non-exempt material is in the declaration of Ms. Banks, see Banks Decl. ¶ 46, who simply states:

> APHIS determined that no meaningful portion could be reasonably released without revealing otherwise protected information. The records withheld in full were analyzed for segregability purposes. No reasonably segregable non-exempt information was withheld from Plaintiff.

> Id.

However, such conclusory statements regarding the agency's segregability finding simply are not sufficient. See Mead Data, 566 F.2d at 261 (to carry burden of proof, agency must provide the "reasons behind their conclusions" that it could not segregate and release non-exempt material); see also Kimberlin v. Dep't of Justice, 139 F.3d 944, 950 (D.C. Cir. 1998) (Vaughn Index held invalid where it "assert[ed] only that entire documents are exempt from disclosure").

Accordingly, because the USDA has not carried its burden to demonstrate that it has segregated and released all "non-exempt" material, the Court should order the agency to release the recording, or, at an absolute minimum, allow PETA to conduct discovery concerning why segregating and releasing such information is not possible. See Kettler Decl. ¶¶ 14-27.

**2.  The Public Interest In Disclosure Of The Names Of USDA Inspectors Who Engaged In Misconduct At The Agriprocessors Facility Far Outweighs The Privacy Interests Of These Agency Employees.**

The USDA withheld from five sworn statements and eight memoranda of interviews the

---

[1] Indeed, such sound technology can be easily downloaded from the internet at no cost to the agency. See, e.g., http://3d2f.com/download/42-521-av-voice-changer-gold-free-download.shtml (web site offering free downloadable voice changing software).

names of federal inspectors who were directly involved in the well-publicized controversy concerning the inhumane slaughter of cattle at Agriprocessors. According to the OIG's investigation report, federal inspectors who were stationed at this facility observed Agriprocessor employees inhumanely slaughtering cattle in violation of the HSA <u>and did nothing to stop it,</u> and engaged in other acts of misconduct. Agriprocessor Report, <u>supra</u> (Exh. 48). The public interest in knowing who these individuals are so that they may be held accountable for their actions and so that the public can scrutinize how the USDA deals with the particular employees in the future, far outweighs the "personal privacy" interests of these agency employees, particularly since the USDA has a proven track record of failing to adequately enforce violations of the laws requiring the humane treatment of animals – a matter of tremendous public concern and debate. <u>See</u> <u>supra</u> at 3-5; <u>see</u> <u>also</u> Kettler Decl. ¶ 8-9.[2]

The USDA contends that the USDA inspectors who were involved in the misconduct at Agriprocessors have a "privacy" interest in not being "identified in connection with an investigation/prosecution," and that the "privacy interests of such individuals outweigh the public interest of disclosure" since release of such information could have a "chilling effect on law enforcement efforts." Exhibit 4 to Def. Mem. at 1, 3. However, the USDA's speculative claims fail to satisfy the government's burden of proof for several reasons.

First, the USDA inspectors involved in this particular incident have an extremely diminished privacy interest. Thus, as explained by the D.C. Circuit, "the status of the individuals in this case as federal employees diminishes their privacy interests . . . because of the corresponding <u>public</u>

---

[2] Plaintiff is not moving for summary judgment as to the government's withholding of names from other records at issue in this particular matter.

interest in knowing how public employees are performing their jobs." Stern v. F.B.I., 737 F.2d 84, 92 (D.C. Cir. 1984) (emphasis added). Indeed, it is hard to imagine a situation where the public interest in knowing how "public employees are performing their jobs" could be any stronger – and, thus, the privacy interest any more diminished – then here, where the USDA's own investigation revealed that USDA inspectors had engaged in "acts of inhumane techniques," and that inspectors also "accepted meat products from [Agriprocessors] employees . . . and engaged in other acts of misconduct," and, even worse, that "[USDA] employees observed the acts of inhumane slaughter and did nothing to stop the practice." Agriprocessor Report, supra (Exh. 48) (emphasis added). Accordingly, the privacy interests of these particular employees are not even remotely comparable to those of private citizens whose names happen to "appear" in government records. Safecard Services, Inc. v. S.E.C., 926 F.2d 1197, 1206 (D.C. Cir. 1991); see also Lesar v. U.S. Dep't of Justice, 636 F.2d 472, 487 (D.C. Cir. 1980)("FBI agents may not have as great a claim to privacy as that afforded ordinarily to private citizens"); accord Stern, 737 F.2d at 92; Lissner v. U.S. Customs Serv., 241 F.3d 1220, 1223 (9th Cir. 2001) ("by becoming public officials, their privacy interests are somewhat reduced").[3]

Second, the USDA has not carried its burden to demonstrate with specificity that releasing the names of USDA inspectors involved in these investigations could in any way "have a chilling effect on law enforcement efforts," as the government baldly asserts in its Vaughn Index. Exh. 4 to

---

[3] Thus, while it is true that low-level law enforcement personnel have some privacy interest in not having their names disclosed in connection with the routine performance of their law enforcement duties, see, e.g., Lesar, 636 F.2d at 487, that interest is diminished when, as here, the public servant may have violated the law in the performance of his/her duties. See, e.g., Providence Journal v. Dep't of the Army, 981 F.2d 552, 568 (1st Cir. 1992); Stern, 737 F.2d at 92-93.

Def. Mem. at 3. Such unsupported assertions plainly do not satisfy the government's burden of proof. See Billington, 233 F.3d at 584 (rejecting FBI's "bald assertion" that information could be withheld because it was not "probative evidence" that exemption was met) (quoting Campbell, 164 F.3d at 30); see also Washington Post, 690 F.2d at 262 (conclusory assertion of privacy expectation will not suffice under the FOIA).

Third, the release of the names of the USDA inspectors here would significantly contribute to the public's understanding as to whether the USDA is sufficiently investigating and enforcing laws requiring the humane treatment of animals, particularly since the public has an important interest in knowing whether USDA inspectors that clearly have not adequately performed their duties as public employees nevertheless continue to be employed by the USDA. Kettler Decl. ¶¶ 30-32. Thus, although the USDA's OIG found that these inspectors were routinely ignoring blatant statutory violations, improperly accepting gifts from company employees, and engaging in other misconduct at this facility, see Agriprocessors Repoprt, supra (Exh. 48); see also, e.g., McNeil, supra (Exh. 46), the only "sanction" the USDA apparently imposed on these federal inspectors was a fourteen-day suspension for one inspector, and warning letters for two others. See McNeil, supra (Exh. 46).

However, the public has a right to know who these inspectors are, whether they have been involved in other misconduct at this or other plants, and whether the USDA is taking any action to actively rectify such flagrant violations of law. Kettler Decl. ¶ 8-9; see also Washington Post, 943 F. Supp. at 31, 36 (D.D.C. 1996) (recognizing "significant public interest [] in shedding light on the workings of the Department of Agriculture" where plaintiff "identified allegations of fraud and conflict of interest, supported by government reports and investigations, as well as newspaper articles and other information in the public domain"); accord Iowa Citizens for Commty. Improvement v.

-31-

U.S. Dep't of Agriculture, 256 F. Supp. 2d 946 (S.D. Iowa 2002).  Particularly since there has been considerable debate concerning the USDA's abysmal efforts to investigate and enforce laws requiring the humane treatment of animals, see supra at 3-5, there is a "legitimate" public interest in knowing who at the USDA "conducted an investigation so those individuals can be subjected to inquiry." Canadian Javelin v. SEC, 501 F. Supp. 898, 904 (D.D.C. 1980) ("[t]he officials at the SEC should not be able to hide behind the FOIA in an effort to keep secret the SEC investigatory process"); accord Iglesias v. CIA, 525 F. Supp. 547, 562 (D.D.C. 1981).

Moreover, contrary to the government's contention that the names of federal employees are "traditionally" protected, Def. Mem. at 27, there is no "per se" rule of nondisclosure of such information.  Stern, 737 F.2d at 91; see also Lesar, 636 F.2d at 487-88 (there is no "blanket exemption" for the names of law enforcement agents).  Here, as demonstrated, there is a substantial public interest in knowing who these individuals are so that the public may better understand how the USDA is performing its enforcement objectives and prevail upon the agency to take appropriate action against  inspectors who are "repeat offenders."  Kettler Decl. ¶ 9; see supra 16-18. Accordingly, the public interest in disclosure of the names of federal inspectors engaged in misconduct at the Agriprocessors facility far outweighs the minimal privacy interests at stake here, and this information must be disclosed.  Stern, 737 F.2d at 92; Canadian Javelin, 501 F. Supp. at 904; accord Iglesias, 525 F. Supp. at 562.

### 3.    The Public Interest in Knowing Where Le Mas Conducted Illegal Animal Testing Outweighs Any Privacy Interests At Stake.

In connection with the USDA's closed investigation of the ammunitions distributor, Le Mas, for potential violations of the AWA's animal research requirement because the company shot live

pigs to test its ammunition, the USDA redacted from two affidavits of USDA investigators reference to the specific location of the shootings under investigation. Kettler Decl. ¶ 10. However, the public interest in knowing where the shootings occurred is substantially greater than any potential "privacy" interests at stake.

As a threshold matter, the USDA has not even identified the privacy interest at stake here, since the Vaughn Index does not even acknowledge that the USDA redacted information reflecting the location of the shootings, but, rather, states that the agency redacted the "name of the individual being investigated and the individual's home address" and also the names of federal employees. Exhibit 2 to Def. Mem. at 27-28. However, in addition to redacting the interviewee's name and home address – to which PETA does not seek access – the USDA also redacted the affiants' reference to the business location where the animal abuse took place. Affidavit, supra (Exhibit 42); see also Affidavit, supra (Exhibit 43) (same). The USDA's failure to address this particular withholding – at all – necessarily means that the agency has not met its burden of proof that the information may be withheld under the FOIA. See Schiller, 964 F.2d 1205, 1210 (D.C. Cir. 1992) ("[T]he withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply'") (quoting King, 830 F.2d at 224) (emphasis in original). Thus, plaintiff is entitled to summary judgment, and release of the redacted information, on this basis alone. Coastal States, 617 F.2d at 870.[4]

Moreover, any privacy interest that might hypothetically exist is minimal at best because the

---

[4] Plaintiff previously made clear that it seeks access to this withheld information. See Joint Rule 16.3 Report at 3.

company's activities associated with testing and promoting its bullets concern "business judgments and relationships," and, thus, "would not reveal anything of a <u>private</u> nature about any employees." <u>Washington Post</u> 863 F.2d at 100-101 (emphasis added); <u>see</u> also <u>Cohen v. EPA</u>, 575 F. Supp. 425, 429 (D.D.C. 1983) (identities of individuals receiving notice letters from the EPA could not be withheld under Exemption 7(C) because the "privacy exemption does not apply to information regarding professional or business activities"); <u>accord</u> <u>Washington Post</u>, 943 F. Supp. at 36 (USDA could not withhold under Exemption 6 names and addresses of farms that improperly received farm subsidies). Accordingly, whatever privacy interest is at stake here – which the USDA has yet to identify – is minimal at best.

On the other hand, the public is entitled to know all of the non-private facts underlying the USDA's investigation of Le Mas, including <u>where</u> the AWA violations occurred. In addition, the public is entitled to monitor whether this entity's activities violate the AWA or other laws designed to protect animals – including state anti-cruelty laws and public safety codes – and whether the USDA exercised its authority to notify state law enforcement of the documented animal abuse. <u>See</u> 7 U.S.C. § 2145(b) (granting USDA authority to work with local authorities to investigate violations of federal <u>or</u> state law). In short, especially because the USDA has not made <u>any</u> showing that there are privacy interests at stake here, the public interest in disclosure must prevail.

## II.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM THAT THE USDA IS ENGAGED IN A PATTERN AND PRACTICE OF WITHHOLDING STATEMENTS OF WITNESSES AND FEDERAL EMPLOYEES IN VIOLATION OF THE FOIA.

Contrary to the argument put forth by the government, plaintiff may challenge the USDA's new practice of withholding witness statements and affidavits – in their entirety – and

forcing FOIA requesters, such as PETA, to file a lawsuit to obtain such clearly non-exempt information. Thus, the Court of Appeals has held that a FOIA plaintiff is entitled to declaratory and injunctive relief when an agency has a pattern, practice, or policy of violating FOIA that harms a plaintiff – all of which is easily demonstrated here. Payne, 837 F.2d at 491.

> A.    The USDA Is Engaged In A Pattern And Practice Of Withholding Statements Of Witnesses And Federal Employees In Violation Of FOIA.

Although the USDA asserts that is has no "official" policy of denying access to statements and affidavits that it obtains from various witnesses during law enforcement investigations, see Declaration of Lesia Banks ("Banks Decl.") ¶ 47, as the D.C. Circuit emphasized in Payne, an agency policy need not be formalized. 837 F.2d at 491. Rather, it is enough that "an agency's refusal to supply information evidences a policy or practice of delayed disclosure or some other failure to abide by the FOIA, and not merely isolated mistakes by agency officials[.]" Id. (emphasis added); see also Better Gov't Ass'n, 780 F.2d at 93 (policy need not be formal to be ripe for review); Continental Airlines, Inc. v. CAB, 522 F.2d 107, 124 (D.C. Cir. 1975) ("[t]he label an agency attaches to its action is not determinative").

Here, there can be no dispute that, prior to 2005, for years the USDA routinely made available to PETA the reports of closed investigations, including the statements and affidavits the agency has obtained from various witnesses, withholding only information that would identify the personal privacy interests of individuals mentioned in those records. See Kettler Decl. ¶ 16 (recalling at least a "dozen" instances in which the USDA released such information). Thus, it was only recently, in response to PETA's June 28, 2005 FOIA request, that the agency for the first time began asserting – on a routine basis – that it may withhold such records in their entirety. See id.

-35-

Moreover, the USDA admits that <u>both</u> APHIS and the OIG – two different components of the USDA – initially withheld all such statements <u>in full</u> in response to the four different FOIA requests at issue in this case. Answer ¶¶ 13, 17, 20, 22. Thus, as the USDA concedes, it was only <u>after</u> plaintiff was forced to file this lawsuit raising a pattern and practice claim that the agency finally capitulated and released the substance of the requested records, withholding the names and other personal identifying information. <u>See</u>, <u>e.g.</u>, Banks Decl. ¶ 13.

The fact that two <u>different</u> offices within the USDA – both APHIS and the Office of Inspector General – suddenly both withheld statements of this nature in response to plaintiff's FOIA requests for investigatory material strongly suggests that this is not just "isolated mistakes" of different FOIA officers. <u>Payne</u>, 837 F.2d at 491. In fact, although the USDA has refused to provide the Administrative Record for this matter, <u>see</u> Joint Rule 16.3 Report at 4, it appears that this new practice of withholding witness statements stems from certain "guidance" that was provided by the agency's Office of General Counsel ("OGC") on this matter. Thus, according to several representatives of animal protection groups who attended a March 15, 2006 meeting held by the USDA, officials from the agency's FOIA Office informed the attendees that the reason the USDA was now withholding witness statements in full was because they had "received guidance" from the OGC that such records "are protected by the privacy exemptions to FOIA." <u>See</u> Declaration of Suzanne Roy, Program Director, In Defense of Animals (Attachment 3 to Kettler Decl.) ¶ 3 ("the Animal Care FOIA Office informed the attendees that it had '<u>received guidance' from the agency's Office of General Counsel to withhold all witness affidavits in full</u> 'based on the privacy exemption' to FOIA") (emphasis added); <u>see also</u> Declaration of Kathleen Conlee, Director of Program Management for Animal Research Issues, The Humane Society of the United States (Attachment 2

-36-

to Kettler Decl.), ¶ 3 ("an APHIS FOIA officer explained that they received guidance and had been 'advised' by the agency's Office of General Counsel to withhold witness affidavits on the grounds that such records are protected by the privacy exemptions to FOIA") (emphasis added).

Indeed, a representative of PETA attended that meeting and specifically raised the issue of "why the USDA was now redacting entire witness affidavits, as that had not been the agency's practice in the past." See Declaration of Debbie Leahy (Attachment 4 to Kettle Decl.) ¶ 3.  In response, Lesia Banks, the Director of APHIS' FOIA Office – and the government's chief declarant in this case – explained that this was one of "several practices by her predecessor that she had changed." Id. ¶ 4 (emphasis added).  Ms. Banks further informed PETA's representative that the agency had decided to change this practice because "it felt that employees of entities licensed by the USDA who were targets of investigations were more likely to speak freely to USDA investigators if they knew that their employers would not be able to read their statements." Id. ¶ 6.[5]

Thus, although the agency insists that there is no "official" policy at work here, it seems that the opposite is true.  For this reason, this case is on all fours with Payne Enterprises, in which the D.C. Circuit concluded that the Air Force had an illegal pattern and practice of violating the FOIA where several different Air Force bases routinely refused to release certain material sought by the plaintiff, even though the Air Force would consistently order the release of the information once an

---

[5] Plaintiff's pattern and practice claim is brought under the APA, and, therefore, should be reviewed based upon an Administrative Record. See infra at 43. However, since the USDA has refused to produce the Record, plaintiff submits the accompanying declarations of Ms. Leahy, Ms. Roy, Ms. Conlee, and Ms. Kettler in support of its motion for summary judgment on this claim. See Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) (court may review extra-record material "when the agency failed to consider factors which are relevant to its final decision"); Kent County, Delaware Levy Court v. U.S. E.P.A., 963 F.2d 391, 396 (D.C. Cir. 1992) (court may consider extra-record material when "agency excluded from the record evidence adverse to its position").

appeal was filed. 837 F.2d at 488. Indeed, plaintiff's pattern and practice claim here is even stronger

than in Payne, since the USDA forces requesters to file a lawsuit. 837 F.2d at 494; see also National

Security Archive Fund v. U.S. Dep't of Air Force, Civ. Action No. 05-571 (April 19, 2006) (Air

Force practice of unreasonable delay in responding to FOIA requests held invalid); Ray v. U.S. Dept.

of Justice, I.N.S. 770 F.Supp. 1544 (S.D. Fla.1990) (ordering the Miami INS office to comply with

FOIA time limits based on a pattern and practice of delay).

　　　　Particularly in light of evidence demonstrating that the new practice is based on a "guidance"

record from USDA's Office of General Counsel, see supra at 37, there also is no merit to the

USDA's contention that plaintiff's pattern and practice claim is not sufficiently "crystallized" to be

challenged here. Def. Mem. at 32-33. Indeed, as in Payne the contours of the practice at issue here

are absolutely clear: beginning in 2005, the USDA FOIA officers suddenly began withholding all

of the statements the agency obtained from witnesses and federal employees during the course of its

investigations, even though its investigations were closed, and even though the agency had routinely

disclosed such information in the past. Kettler Decl. ¶¶ 18; see also Payne, 837 F.2d at 492 ("[t]he

question is simply whether the blanket refusal of [Air Force base FOIA officers] to grant Payne's

FOIA requests when there is limited competition for a contract, without any legal reason apart from

an admittedly inadequate reference to Exemptions 4 and 5, warrants equitable relief"). Under such

circumstances, involving "repeated conduct" by an agency "respecting specific documents and a

repeat requester of such documents," the government itself recognizes that an agency policy is

sufficiently "crystallized" under Payne. Def. Mem. at 32 (emphasis in original). See also Animal

Legal Defense Fund v. Veneman, No. 04-15788, 2006 WL 3375347 (9th Cir. Nov. 22, 2006)

(USDA's decision to withdraw proposed policy, announced at a public meeting, is "final agency

action" that is reviewable under the APA).[6]

Accordingly, it is clear that the USDA has engaged in a new practice to deny PETA access to statements and affidavits it obtains from witnesses after it has closed an investigation.

**B.    The USDA's Practice of Withholding Information Under The FOIA Harms PETA.**

The USDA' practice of withholding statements of witnesses and federal employees causes PETA substantial harm, which the USDA does not even attempt to dispute. Kettler Decl. ¶ 13. As one of the nation's leading animal protection organizations, PETA expends substantial resources monitoring the enforcement activities of the USDA to ensure that the agency fulfills its statutory duties under the Animal Welfare Act and other laws requiring the humane treatment of animals. Id. ¶ 3. In some cases, PETA also monitors the work of specific USDA employees and informs the USDA if they consistently fail to perform their investigatory or enforcement duties. Id. Indeed, over the years the USDA has relied on PETA for information concerning numerous of USDA investigations, such as the agency's investigation of Agriprocessors that was initiated as a result of PETA's video showing the inhumane practices at this facility. See id..

Thus, substantial information contained in the statements of witnesses and federal employees provides critical facts that assist PETA in its efforts to monitor the USDA's activities and to assist the agency in enforcing the AWA and other laws for the protection of animals. Accordingly, the

---

[6]   See also Her Majesty the Queen in Right of Ontario v. EPA, 912 F.2d 1525, 1531-1532 (D.C. Cir. 1990) (several EPA letters "serve to confirm a definitive position that has a direct and immediate impact on the parties" even though author stated that the letters did not reflect the views of EPA); Barrick Goldstrike Mines, Inc. v. Browner, 215 F.3d 45, 49 (D.C.Cir. 2000) (holding that "a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position into final agency action"); see also Seminole Nation of Oklahoma v. Norton, 223 F. Supp. 2d 122, 142 (D.D.C. 2002).

USDA's abrupt change in practice – by which it now routinely refuses to release this information unless and until a lawsuit is filed – significantly impedes plaintiff's pursuit of its organizational objectives.  Id.[7]

    **C.**    **Plaintiff Has Stated A Claim For Relief Under The APA.**

The USDA's contention that plaintiff's pattern and practice claim may not proceed under the APA, Def. Mem. at 29-30, is also wrong.  The USDA's argument is based on the misguided notion that plaintiff could pursue such a claim under the FOIA, and that, accordingly, review under the APA is prohibited since that Act only authorizes review of agency action when there is no "prior, adequate, and exclusive opportunity for judicial review," 5 U.S.C. § 703.  Def. Mem. at 30 (citations omitted).

However, contrary to the government's contention, the FOIA does not provide any remedy, much less one that is "adequate," for plaintiff's claim that the USDA is operating pursuant to an illegal policy and practice of routinely withholding non-exempt information under the FOIA during the administrative process, and then releasing such information only after a lawsuit is filed.  Rather, the FOIA provides district courts with jurisdiction only to compel the disclosure of "agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(3)(B) (emphasis added); see also U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989) (federal jurisdiction for a FOIA

---

[7] For the same reasons, PETA easily satisfies the Article III requirements for standing to bring this APA claim.  See Federal Election Com'n v. Akins, 524 U.S. 11 (1998) (organization had standing to sue based on injury to plaintiff's ability to obtain information it was entitled to by law); see also Abigail Alliance for Better Access To Devt Drugs v. FDA, __ F.3d__, No. 04-350, 2006 WL 3359334, * 2 (D.C. Cir. Nov. 21, 2006) (organization had standing to challenge regulation because it "had to divert significant time and resources from these activities toward helping its members and the public address the unduly burdensome requirements" of a regulation).

claim is dependent "on a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records'").  Accordingly, once the records in dispute are actually <u>released</u> by the agency – as occurred here – the Court no longer has any jurisdiction under the FOIA to remedy the pattern and practice.  <u>See id.</u>

Thus, although a district court may under the FOIA order an agency to produce records that the agency has illegally "withheld" under one of the nine exemptions to the statute, the Act does not provide courts with jurisdiction to address over-arching policies and practices that govern <u>how</u> an agency processes FOIA requests or otherwise complies with its statutory duties <u>in the future</u>.  <u>Cf. Chrysler Corp. v. Brown</u>, 441 U.S. 281 (1979)  ( there is no private right of action under the FOIA to <u>prevent</u> an agency from producing records); <u>Tax Analyst v. IRS</u>, 117 F.3d 607 (D.C. Cir. 1997) (FOIA does not empower courts to order agencies to "publish" information in the Federal Register (internal citations omitted).  Accordingly, the FOIA does not provide any relief – much less an "exclusive" or "adequate" remedy – with respect to plaintiff's claim that the USDA continues to operate pursuant to an illegal practice of withholding particular categories of non-exempt records – <u>i.e.</u>, statements and affidavits the agency obtains from various witnesses – until PETA brings a lawsuit.  <u>See also</u> <u>Bowen v. Massachussetts</u>, 487 U.S. 879, 904 (1988) (Court held that federal district courts have jurisdiction under the APA to review the agency's Medicaid determinations because the Tucker Act did <u>not</u> authorize the Claims Court to provide the precise form of relief sought by the plaintiff – <u>i.e.</u>, prospective injunctive relief); <u>see Payne Enterprises</u>, 837 F.2d at 487 n.1 (recognizing that plaintiff's challenge to agency's pattern and practice of delay in processing FOIA requests was cognizable as an "unreasonable delay" case under the APA).

Not surprisingly then, contrary to the government's contention in its brief, Def. Mem. at 31,

courts, including this one, frequently review agency policies and regulations that govern an agency's policy concerning <u>processing</u> FOIA requests under the APA, <u>not</u> the FOIA. <u>See</u>, <u>e.g.</u>, <u>Venetian Casino Resort, L.L.C. v. E.E.O.C.</u>, 409 F.3d 359 (D.C. Cir. 2005) (challenge to EEOC "long standing policy" concerning disclosure of information under FOIA was ripe for review under the APA); <u>see also</u> <u>Payne Enterprises</u>, 837 F.2d at 487 n1 (APA pattern and practice claim brought as an "unreasonable delay" claim); <u>Ctr. for Biological Diversity v. Guiterrez</u>, 451 F. Supp. 2d 57 (D.D.C. 2006); <u>Sierra Club v. DOI</u>, 384 F. Supp. 2d 1 (D.D.C. 2004); <u>Swan View Coalition v. Dep't of Agriculture</u>, 39 F. Supp. 2d 42 (D.D.C. 1999) (reviewing APA challenge to USDA practice of violating FOIA's time limits).

In fact, in <u>Better Gov't Assn</u>, the <u>only</u> claim that the D.C. Circuit adjudicated was the plaintiffs' facial challenge to the Department of Justice's guidelines governing the processing of FOIA requests – <u>a claim that plaintiffs brought under the APA, not FOIA</u>. <u>See</u> <u>Better Gov't Assn</u>, 780 F.2d at 92-5 (facial challenge to agency guidelines was ripe for review); <u>see also</u> Complaint, <u>Nat'l Wildlife Fed'n v. Dep't of Interior</u>, Civil Action No. 83-3586 (Dec. 1, 1983) (Exh. 60) at 11.

As in these cases, here plaintiff contends that the USDA is operating pursuant to a new policy and practice of withholding <u>in full</u> the statements and affidavits it has obtained from various witnesses, when such records clearly are not exempt in their entirety, as the agency itself has traditionally recognized. (Complaint ¶ 30). Accordingly, it is appropriate for plaintiff's pattern and practice claim to proceed under the APA.

### D.    In the Alternative, Plaintiff Is Entitled To Discovery To Test The Assertions Of Ms. Banks And Ms. MacNeil And To Develop A Factual Record In The Case.

Because plaintiff's challenge to the agency's pattern and practice of denying access to witness

statements in their entirety is brought under the APA, the Court should not consider the post hoc declarations provided by the USDA at this time, since APA review is limited to the Administrative Record that formed the basis for the new practice. See 5 U.S.C. § 706; see also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 (1971). However, here the USDA has refused to provide an Administrative Record on this issue. See Joint Rule 16.3 Report at 4.

Therefore, if the Court chooses to consider the agency's post hoc declarations, plaintiff should be permitted to take discovery to test the agency's conclusory and completely self-serving assertions that it has no "official" policy on this matter. See Banks Decl. ¶ 47; see also Fed. R. Civ. P. 56(f); Gerber v. Norton, 294 F.3d 173, 181 (D.C. Cir. 2002) ("It would be extraordinarily unfair to permit the Service to rely on such a post-complaint factual assertion, and at the same time allow the agency to deny its opponents the ability to test the assertion's veracity through discovery."); Swan View Coal. v. Dep't of Agriculture, 39 F. Supp. 2d 42, 45 (D.D.C. 1999) (permitted discovery to support plaintiff's APA claim that USDA practice violated FOIA); cf. Assoc. of Am. Physicians and Surgeons v. Clinton, 997 F.2d 898 (D.C. Cir. 1993) (remanding for discovery to pursue APA claims under FACA); Nat. Res. Defense Council v. Pena, 147 F.3d 1012, 1024 (D.C. Cir. 1998) (remand for discovery to support standing allegations); CEI Washington Bureau v. Dep't of Justice, No. 05-5446, 2006 WL 3359322 (D.C. Cir. Nov. 21, 2006) (remanded FOIA suit for evidentiary hearing, where agency declarations created a dispute of fact).

Thus, as described in the attached Rule 56(f) declaration of Lori Kettler, particularly in light of the voluminous evidence that the agency in fact has adopted a new practice of withholding witness statements in their entirety – pursuant to "guidance" of the agency's OGC – to adequately respond to the unsupported assertions made in the government's declarations, plaintiff would need to take

discovery.    Kettler Decl. ¶ 14-27.  Such discovery would include:  (1) records concerning the manner in which the USDA handles FOIA requests for investigatory material, including, but not limited to, any exchanges between APHIS and OIG concerning this matter; (2) any records indicating whether the USDA has withheld witness statements and affidavits with respect to other FOIA requesters; (3) the basis for the USDA's decisions to withhold the witness statements and affidavits with respect to the four FOIA requests at issue in this case; and (4) whether USDA FOIA officers are likely to withhold such information in the future.  See Kettler Decl. ¶ 25.

Accordingly, at this time, summary judgment for the defendant on this issue is entirely inappropriate.  See, e.g., Gerber, 294 F.3d at 181 (permitting discovery in APA suit to test assertions of agency declarant);  CEI v. Dep't of Justice, __ F.3d __, 2006 WL 3359322 (D.C. Cir. Nov. 21, 2006) (vacating summary judgment ruling because dispute of fact existed in FOIA suit).  Thus, either the agency must produce the Administrative Record on this issue – which should necessarily include all of the above enumerated information, and especially all records concerning any "guidance" produced by the OGC on this issue – or plaintiff should be permitted to take discovery to obtain such evidence.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court deny defendant's Motion to Dismiss or, Alternatively, for Summary Judgment, and grant plaintiff's Cross-Motion for Summary Judgment, or, in the alternative, deny defendant's Motion for Summary Judgment and permit plaintiff to take discovery concerning: (a) the basis for the agency's exemption claims and (b) whether the agency has in fact employed a new practice of denying access to non-exempt witness statements and affidavits.

Respectfully submitted,


_____/s/ Erin M. Tobin_____
Erin M. Tobin
(D.C. Bar No. 494948)
Katherine A. Meyer
(D.C. Bar No. 244301)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave. N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049 fax

Date:   December 6, 2006          Attorneys for Plaintiff

-45-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS**, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | )   Civ. Action No. 06-930 (RMC) |
| v. | ) |
| | ) |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## (PROPOSED) ORDER

This matter is before the Court on the parties' cross-motions for summary judgment.  On consideration of the motions and the entire record before the Court, it is, by the Court, this ___ day of _____, 2006,

ORDERED that plaintiff's motion for summary judgment is granted; and it is further

ORDERED that defendant's motion for summary judgment is denied; and it is further

ORDERED that defendant's practice of withholding statements of witnesses and federal employees in response to plaintiff's Freedom of Information Act ("FOIA") requests shall be set aside; and it is further

ORDERED that defendant is enjoined from categorically withholding the statements and affidavits of witnesses and federal employees when processing FOIA requests; and it is further

DECLARED that defendant's pattern and practice of withholding statements and affidavits of witnesses and federal employees is without basis under the FOIA; and it is further

ORDERED that, within 30 days of the date of this Order, defendant shall provide to

plaintiff the following material: (a) the CD recording of a witness's statement to the United

States Department of Agriculture concerning Mr. Roy Horn; (b) the names of federal inspectors

included in witness statements attached to the Office of Inspector General's April 25, 2005

Report of Investigation of Agriprocessors; (b) the location of the shootings described in the two

affidavits attached to the Animal & Plant Health Inspection Service's March 1, 2005 Report of

Investigation of Law Enforcement Military Ammunitions Sales.


_____
U.S. District Judge Rosemary M. Collyer