Civ. Action No. 06-930 (RMC)


EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, <br><br> Defendant. | Civ. Action No. 06-930 (RMC) |

## DECLARATION OF LORI KETTLER

1.  I am Senior Counsel with the Research & Investigations Department of People for the Ethical Treatment of Animals ("PETA"), the plaintiff in this matter. Pursuant to Rule 56(e) and Rule 56(f) of the Federal Rules of Civil Procedure, I submit this Declaration in support of plaintiff's Motion for Summary Judgment or, in the Alternative, Opposition to Defendant's Motion to Dismiss or, Alternatively, for Summary Judgment. The statements contained in this Declaration are true and correct to the best of my personal knowledge.

2.  Founded in 1980, PETA is one of the largest animal protection organizations in the world with more than one million members and supporters. PETA seeks to ensure the humane treatment of animals through research, public education, cruelty investigations, animal rescue, grassroots activism, and legal advocacy.

3.  Since PETA's inception, the organization has relied heavily on the Freedom of Information Act ("FOIA") to obtain information to pursue PETA's work to end animal suffering. In particular, PETA uses information obtained through FOIA requests to draw attention to the

institutional failure of the United States Department of Agriculture ("USDA") to adequately investigate acts of cruelty and to enforce the Animal Welfare Act ("AWA") against violaters of that statute; to advocate to the USDA for stronger enforcement of the AWA and other laws requiring the humane treatment of animals, such as the Humane Methods of Livestock Slaughter Act ("HSA") and the Poultry Products Inspection Act; and to assist the USDA in its enforcement efforts by providing the agency with additional information obtained by PETA's own researchers and investigators. In some cases, PETA monitors the activities of specific employees and informs the USDA (as well as the public) if certain officials do not adequately perform their investigatory or enforcement duties. PETA expends substantial resources pursuing these activities.

4.    The FOIA continues to be a critical tool for PETA, and the organization routinely submits FOIA requests to the USDA concerning the agency's investigations of probable violations of the AWA and other statutes administered by the agency. Often the FOIA requests submitted by PETA pertain to complaints and concurrent requests for investigations that PETA has submitted to the agency as a result of concerns expressed to PETA by its members and other concerned citizens. Other times, the FOIA requests pertain to alleged violations of the law uncovered by PETA's researchers and investigators. Thus, for example, with respect to the four FOIA requests at issue in this case, PETA sought the information to ascertain the status of complaints that PETA had filed concerning these activities, and to also ascertain whether the agency had resolved those complaints and/or imposed any penalties or sanctions on those involved in these activities.

5.    Information contained in USDA investigation reports, and the statements of

witnesses and USDA inspectors and investigators in particular, are critical to PETA's efforts to ensure that animals used in industries, such as factory farms and circuses, are treated in accordance with the law, and that the USDA exercises its authority to enforce those laws when violations occur. Generally, in PETA's experience, the statements of witnesses and USDA personnel contain the most complete narrative of the violations, *i.e.*, the detailed account of what actually happened to the animals, while the agency's final investigation reports typically only lists the citations to the regulations that were violated, the title of the regulations, a one-sentence summary of the conduct required by the regulations, a list of exhibits to support the violations, and a brief summary of the witness's statement. Accordingly, without access to the actual witness accounts it is extremely difficult for PETA to know what actions are taken by the USDA and the basis for the agency's final enforcement decision.

6.   PETA seeks access to all of the facts associated with the USDA's investigations in order to scrutinize the USDA's enforcement activities, and whether the USDA imposes adequate penalties on companies and individuals who have violated the AWA or other laws prohibiting the inhumane treatment of animals. Information contained in witness statements to the USDA sheds light on such things as the severity of the violations that may be involved in a particular incident and whether a violator is making good faith efforts to comply with the relevant laws, which are factors that the USDA is required by the AWA to consider when deciding to assess a civil penalty against a violator of the Act. See 7 U.S.C. § 7149(b) ["[t]he Secretary shall give due consideration to the appropriateness of the penalty with respect to the size of the business of the person involved, the gravity of the violation, the person's good faith, and the history of previous violations. Any such civil penalty may be compromised by the

Secretary").

7. For example, in relation to the USDA's investigation of the Siegfried & Roy incident, PETA seeks <u>all</u> of the facts associated with the investigation, including any information contained on the CD recording of a witness's statement to the USDA, in order to inform the public's understanding as to whether APHIS's decision not to impose <u>any</u> sanctions on Siegfried & Roy was reasonable – when APHIS itself concluded in its investigation report that the company had violated several AWA regulations. <u>See</u> Excerpt, U.S. Department of Agriculture, Animal & Plant Health Inspection Service, Report of Investigation (Sept. 28, 2004) (Exh. 18 to Plaintiff's Cross-Motion for Summary Judgment or, In The Alternative, Opposition to Defendant's Motion for Summary Judgment or, Alternatively, to Dismiss ("Plf. Mot.")).

8. In addition, although the USDA released the written witness statements and affidavits at issue in plaintiff's complaint, the USDA continues to withhold information contained in these statements that also is critical to PETA's efforts to educate the public about the USDA's enforcement activities. Thus, in regard to PETA's October 65, 2006 FOIA request – which requested information from the USDA concerning the agency's investigation of slaughter practices engaged in by Agriprocessors employees – PETA continues to seek the names of the specific USDA inspectors who were stationed at this facility and who observed the inhumane practices there.

9. With respect to these individuals, the USDA concluded that some of these inspectors had "observed the acts of inhumane slaughter and did nothing to stop the practice," and engaged in other misconduct, including receiving improper gifts from Agriprocessor employees. U.S. Department of Agriculture, Office of Inspector General-Investigations, Report

–4–

of Investigation (April 25, 2005) (Exh. 48 to Plfs. Mot.). Access to the names of these specific inspectors is critical to the ability of PETA, and, therefore, the public, to identify whether these government employees who continue to be employed by the USDA are "repeat offenders" and whether such individuals are reported for misconduct in this and future investigations so that PETA may prevail upon the agency to take appropriate action to rectify and, where appropriate, penalize such behavior. For this reason, access to the names of these specific individuals makes it possible for PETA and others to monitor the future activities of these individuals, and be informed as to whether the USDA takes disciplinary action with respect to them, or whether the individuals continue to be employed by the USDA at this or other facilities.

10. Similarly, in relation to the USDA's investigation of Law Enforcement Military Ammunitions Sales ("Le Mas") – the company that circulated a promotional video showing company employees shooting live pigs to test the efficacy of the company's bullets – the USDA continues to withhold from two affidavits attached to the final investigation report the location of the activities under investigation.

11. However, because the USDA agreed to an extremely minimal penalty for the company's activities of only $ 2,750, even though the USDA found that the company had committed eight separate violations of AWA regulations, see USDA, Investigative and Enforcement Services, Settlement Agreement (undated) (Exh. 39 to Plfs. Mot.), PETA is very concerned that this minimal penalty will not deter future violations by this or other facilities. As a result, PETA has worked to uncover the location of the pig shootings depicted on the video and has also approached prosecutors in various jurisdictions where the abuse might have occurred to urge such officials to investigate the activities. However, because the USDA has not officially

acknowledged the location of the events, PETA's efforts have been unsuccessful.

12. Thus, although PETA has repeatedly requested that such information either be provided to PETA or to local law enforcement, to the best of my knowledge, the USDA never notified law enforcement authorities in the appropriate jurisdiction that the animal abuse had occurred, that the activities violated the federal AWA, and that the activities might also violate state anti-cruelty or public safety laws. Accordingly, release of this information would inform the ongoing debate as to whether the USDA is sufficiently enforcing the AWA, and would also allow PETA or other members of the public to inform local law enforcement officials about the abuse.

13. The inability to obtain timely access to substantive information contained in the statements of witnesses and USDA inspectors and investigators significantly frustrates PETA's efforts to ensure the humane treatment of animals, to educate the public about animal abuse, to advocate to the USDA for stronger investigations and enforcement of the humane laws, and to assist the USDA with its investigations. In addition, because the USDA withheld witness statements and affidavits from PETA, PETA was required to expend considerable resources to file administrative appeals of each of these decisions, and to file this lawsuit in federal district court, in order to gain access to non-exempt information to which PETA is entitled under the FOIA.

**Plaintiff Needs Discovery In Order To Adequately Respond To Defendant's Declarations**

14. I have reviewed the federal defendant's Memorandum in Support of Motion to Dismiss or, Alternatively, for Summary Judgment ("Def. Mem."), Statement of Material Facts, and supporting declarations. Defendant makes several unsupported assertions of fact in the

declarations of Lesia Banks and Deirdre MacNeil that, if allowed by the Court, plaintiff will be unable to adequately respond to unless plaintiff has an opportunity to conduct discovery. For example, concerning plaintiff's Administrative Procedure Act ("APA") pattern and practice claim, the government asserts that:

(a) "APHIS does not have an official policy or practice of categorically withholding documents, particularly witness statements or affidavits, in response to FOIA requests and appeals." Declaration of Lesia Banks ¶ 47; and

(b) "USDA OIG has not adopted a regulation or a policy and practice of withholding in their entirety statements of witnesses and USDA employees with regard to FOIA requests." Supplemental Declaration of Deirdre MacNeil ¶ 4.

15. However, these statements are directly contradicted by evidence that the USDA has recently adopted a new policy and practice of routinely withholding witness statements and affidavits.

16. Thus, in the past, PETA has requested and received from the USDA more than a dozen investigation reports throughout the years, and, until very recently, the USDA routinely released all of the witness statements that were attached to those reports in its responses to PETA's requests. For example, in 1991 PETA requested information from the USDA under the FOIA concerning the agency's investigation of injuries to members of the public who paid to "wrestle" bears belonging to a company known as Tyler Bear Wrestling. In response, the USDA released the investigation report and all of the witness statements, which included the statement of the owner of Tyler Bear Wrestling, the statement of the owner of the venue where the wrestling match was held, the statement of local law enforcement personnel, and the statement of

a veterinarian. See, e.g., Attachment 1 (statement of the owner of Tyler Bear Wrestling).

17. The USDA continued to release witness statement to PETA until as recently as 2003, when PETA requested information about the drowning death of a young elephant named Benjamin who was in the custody of Ringling Bros. and Barnum & Bailey Circus ("Ringling Brothers") at the time of his premature death. The USDA released to PETA the statements of the USDA Animal Care Program's supervisory animal care specialist, the three USDA investigators and one investigator trainee, the Animal Care veterinarian, a private veterinarian, an employee of Ringling Brothers, and three individuals who were present when the elephant drowned. The USDA's response to PETA's FOIA request for information about the death of Benjamin, received by PETA on November 6, 2003, is one of the last times, if not the last time, that the USDA voluntarily released witness statement to PETA, without requiring PETA to file a lawsuit to obtain such records.

18. However, beginning in 2005, for no apparent reason, the USDA began routinely withholding from PETA statements and affidavits that it had obtained from witnesses and federal investigators and inspectors, in response to PETA's requests for investigatory material. For example, in response to PETA's April 6, 2005 FOIA request to APHIS, seeking records related to APHIS' investigation of the sudden deaths of Connie and Barbara, two elephants in the custody of the Culpepper and Merriweather Circus, on December 6, 2005, after its investigation was closed, APHIS released some records to PETA but withheld ten witness affidavits included in the investigation report in their entirety. As a result, very little information was revealed concerning the cause of the elephants' deaths.

19. In response to PETA's June 28, 2005 FOIA request to APHIS seeking the

–8–

agency's investigation report concerning the attack on performer Roy Horn of "Siegfried and Roy" by one of the show's white tigers during a live performance, on July 14, 2005, after closing the investigation, APHIS released the investigation report in part, but withheld in full three affidavits attached to the report. This included an affidavit of the Deputy Director of Animal Care, an Animal Care veterinarian, and an audience member who witnessed the attack. APHIS also withheld an audio recording of an informant's telephone discussion with the USDA, invoking Exemptions 6 and 7(C) of the FOIA.

20. In response to PETA's August 15, 2005 FOIA request to APHIS seeking a copy of the USDA's investigation report concerning the agency's investigation of Law Enforcement Military Ammunition Sales ("Le Mas"), the company that distributed a promotional video showing its employees shooting and killing pigs in order to test the efficacy of its ammunition, on January 12, 2006, once APHIS closed the investigation, released to PETA some responsive records, but withheld, in their entirety, two affidavits that the agency had obtained from USDA investigators. These were the only affidavits included in the report.

21. In response to PETA's October 26, 2005 FOIA request to a different office within the USDA, the Office of Inspector General, requesting a copy of OIG's report of the investigation of Agriprocessors in connection with its inhumane practices for slaughtering cattle, on February 28, 2006, once the OIG closed its investigation of Agriprocessors, the OIG released some responsive records but, consistent with APHIS' handling of PETA's FOIA requests, withheld thirteen witness statements in their entirety. The withheld statements included five sworn statements and eight memoranda of interviews obtained directly from Agriprocessor employees, USDA inspectors, and USDA investigators.

22. On March 15, 2006, APHIS held a meeting with several animal protection groups. See Declaration of Kathleen Conlee (Dec. 5, 2006) (Attachment 2); see also Declaration of Suzanne Roy (Dec. 5, 2006) (Attachment 3); Declaration of Debbie Leahy (Dec. 6, 2006) (Attachment 4). According to several individuals who attended this meeting, APHIS announced that it had received "guidance" and been "advised" by the agency's Office of General Counsel to withhold witness affidavits from the public because such records should be protected by the privacy exemptions of the FOIA. See Conlee Decl. ¶ 3; Roy Decl. ¶ 3.

23. Debbie Leahy, Director of Captive Animals & Entertainment Issues at PETA, was also present at the meeting. Leahy Decl. ¶ 2. Ms. Leahy specifically inquired as to why APHIS was now withholding all such information, when this had not previously been APHIS' practice. Id. ¶ 3. Ms. Banks responded by explaining that she had "changed" several practices put in place by her predecessor, and that now, "under her direction," APHIS "redacted entire witness affidavits because it felt that employees of entities licensed by the USDA who were targets of investigations were more likely to speak freely to USDA investigators if they knew that their employers would not be able to read their statements." Id. ¶ 4, 6.

24. PETA administratively appealed all four of the FOIA requests discussed above. However, it was not until several months after PETA filed this lawsuit that both APHIS and the OIG – on the same day, July 17, 2006 – decided to release the affidavits and statements, withholding the names and personal identifying information of private citizens and federal employees.

25. All of the evidence enumerated in above paragraphs 14-22, directly contradicts the unsupported allegations of the USDA FOIA officers that the USDA does not have a practice of

routinely withholding affidavits and statements that the agency obtains from various witnesses in response to PETA's FOIA requests for investigatory material. Although under the APA, review of agency actions must be based on an Administrative Record, the government has refused to provide any such material. Instead, it has submitted the declaration of Ms. Banks and Ms. MacNeil in support of its position that the agency has no pattern and practice of withholding witness statements. See Declaration of Lesia Banks ¶ 47; see also Declaration of Deirdre MacNeil ¶ 4. Therefore, if the Court considers such statements on this point, plaintiff will need to take discovery to adequately respond to the USDA's allegations on this matter, in order to obtain the following:

    (a)    documents or other information governing the manner in which the USDA handles FOIA requests for investigatory material, including, but not limited to, exchanges between the OIG and APHIS concerning how to process FOIA requests for investigatory material, or exchange between these components of the USDA and the USDA's OGC;

    (b)    records or other information indicating whether the USDA has withheld statements and affidavits with respect to other FOIA requesters;

    (c)    the basis for the USDA's decisions to withhold the statements and affidavits with respect to the four FOIA requests at issue in this case; and

    (d)    whether USDA FOIA officers are likely to withhold such information from plaintiff again in the future.

    26.    In addition, concerning PETA's FOIA request for information concerning the USDA's investigation of Siegfried & Roy in connection with the attack on Mr. Horn by one of the tigers exhibited by the show, the USDA claims that it may withhold a CD recording of an oral statement made by a witness to the USDA because:

    (a)    "The caller's privacy interests are also implicated because the caller may be

    identified by his or her voice. Disclosing the CD may subject this person to substantial inquiries or harassment by the media and other interested parties." Exh. 2 to Def. Mem. at 23 (APHIS Vaughn Index); and

(b)    "the information on the CD recording reveals nothing about APHIS activities. APHIS withheld this recording in full because the contents of this recording would not educate the public about the inner workings of APHIS." Id.

27.    However, the USDA does not provide any support for its allegation that the individual who provided a statement to the USDA faces any potential risk of being identified as a result of disclosure of the CD recording. The USDA also did not provide any description of the content of the statement to justify the agency's generic claim that the CD recording "reveals nothing about APHIS activities." Id. Therefore, if the Court declines to grant summary judgment for PETA or the grounds that the government has not met its burden of proof, in order to respond to these additional statements, PETA will need to take discovery, in the form of interrogatories, to ascertain:

(a)    whether the witness was an audience member;

(b)    whether the witness requested that his or her identity be kept confidential;

(c)    with whom the witness spoke during the telephone call; and

(d)    what matters were discussed in the witness's statement.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____    12/6/06
Lori Kettler                                 Date
People for the Ethical Treatment of Animals