UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, ) ) ) Plaintiff, ) ) v. ) ) UNITED STATES DEPARTMENT OF ) AGRICULTURE, ) ) Defendant. ) | Civ. Action No. 06-930 (RMC) |

Pursuant to Local Rule 7(h), Plaintiff People for the Ethical Treatment of Animals ("PETA") respectfully submits the following statement of material facts as to which there is no genuine dispute.

**I.  Plaintiff's Statement of Material Facts as To Which There Is No Genuine Dispute.**

1. There is substantial public interest in the issue of whether the USDA is adequately enforcing the Animal Welfare Act.  See Steve Neavling, <u>Agency faulted for not cracking down on violators,</u> FREE PRESS, July 12, 2006 (Exh. 2) ("USDA's inaction . . . highlighted complaints from within the USDA's ranks that the agency is simply not enforcing the Animal Welfare Act"); Sally Kestin, <u>Regulatory System Misses Many Problems</u>, SOUTH FLORIDA SUN-SENTINEL 1A, May 23, 2004 (Exh. 3) (reporting view of Congressperson that the USDA's "lack of follow through is unacceptable"); Robert J. Masonis, <u>The Improved Standards For Laboratory Animals Act And The Proposed Regulations: A Glimmer Of Hope In The Battle Against Animal Research</u>, 16 B.C. ENVTL. AFF. L. REV. 149, 150 (1988) ("The scarcity of federal case law addressing the use of laboratory animals in medical research under AWA's provisions does not reflect accurately the intensity of controversy surrounding both the Act's substance and the

United States Department of Agriculture's (USDA) enforcement of AWA's provisions"); see also id. at 150 n.6 (citing numerous journal articles criticizing the USDA's enforcement of the AWA).

2.     A 1985 General Accounting Office Report reported that Animal and Plant Health Inspection Service ("APHIS") inspectors spent a minimal amount of time conducting AWA inspections and that training of APHIS inspectors was "inadequate." U.S. GAO, Report to the Chairman, Subcommittee on Agriculture, Rural Development and Related Agencies Committee on Appropriations, United States Senate, The Department of Agriculture's Animal Welfare Program ii, 7 (May 16, 1985) (Exh. 4).

3.     A September 2005 Report by the USDA's Office of Inspector General found that the Eastern Region of APHIS' Animal Care Division is not "aggressively pursuing enforcement actions against violators of the AWA;" that, as a matter of agency policy, APHIS "offers a 75-percent discount on stipulated fines as an incentive for violators to settle out of court," and, "as a result, violators consider the monetary stipulation as a normal cost of conducting business rather than a deterrent for violating the law." U.S. Department of Agriculture, Office of Inspector General, Audit Report, APHIS Animal Care Program, Inspection and Enforcement Activities i-ii (Sept. 2005) (Exh. 1).

4.     PETA has become actively involved in bringing to the attention of the USDA practices that violate the AWA; monitoring and publicizing the USDA's enforcement efforts, and lack thereof; and advocating for stronger protections for animals. Declaration of Lori Kettler ("Kettler Decl.") ¶ 3 (Exh. 5). PETA relies heavily on the Freedom of Information Act ("FOIA") to obtain information to pursue PETA's work to end animal suffering. Id. In some cases, PETA

also monitors the activities of specific employees and informs the USDA (as well as the public) if certain officials do not adequately perform their investigatory or enforcement duties. Id. PETA expends substantial resources pursuing these activities. Id.

5. PETA routinely submits FOIA requests to the USDA concerning the agency's investigations of probable violations of the AWA and other statutes administered by the agency. Id. ¶ 4.

6. Information contained in USDA investigation reports, and the statements of witnesses and USDA inspectors and investigators in particular, are critical to PETA's efforts to ensure that animals used in industries, such as factory farms and circuses, are treated in accordance with the law, and that the USDA exercises its authority to enforce those laws when violations occur. Id. ¶ 5.

7. PETA seeks access to facts of USDA's investigations in order to scrutinize the USDA's enforcement activities, and whether the USDA imposes adequate penalties on companies and individuals who have violated the AWA or other laws prohibiting the inhumane treatment of animals. Id. ¶ 6.

8. The USDA's investigation reports and the statements that non-federal witnesses, federal inspectors, and investigators provided to the USDA during the course of an investigation provide critical information that PETA needs to pursue its efforts to advocate for the protection of animals and monitor whether the USDA is performing its statutory obligations in this regard. Id. ¶ 5.

9. Until recently, the USDA routinely released to PETA such records, except for the names and other personal information concerning private citizens. Id. ¶ 16. This material

typically contains the most detailed accounts of the facts of a particular investigation and the severity of violations of law that may have been committed. Id. ¶ 5.

10. Beginning in 2005, the USDA began withholding such records in their entirety. Id. ¶ 18. Both APHIS and the USDA's Office of Inspector General have withheld such information from PETA, since 2005. Id. ¶ 19, 21.

11. The inability to obtain timely access to substantive information contained in the statements of witnesses and USDA inspectors and investigators hinders PETA's ability to pursue its organizational objectives. Id. ¶ 13. In addition, because the USDA withheld witness statements and affidavits from PETA, PETA was required to expend considerable resources to file administrative appeals of each of these decisions. Id. It was not until PETA filed this lawsuit that the USDA disclosed the witness statements and affidavits sought by plaintiff in the four FOIA requests at issue in this case, although with the names and personal identifying information of witnesses redacted. Id. ¶ 24.

12. On June 28, 2005, plaintiff submitted a FOIA request to APHIS seeking the USDA's investigation report concerning the mauling of Roy Horn by one of the white tigers routinely exhibited by Mr. Horn in the Las Vegas performance, "Siegfried and Roy." Letter from Lisa Wathne to Lesia Banks (June 28, 2005) (Exh. 6). In this incident, the tiger purportedly and with no provocation attacked Mr. Horn onstage during a nightclub performance. Tiger beat: Siegfried & Roy Tragedy puts big cats in center stage - News Debate, Nov. 7, 2003 (Exh. 7). The incident has been the subject of much public attention and debate, including whether it is safe and appropriate to exhibit exotic animals for purely entertainment purposes. See, e.g., id. ("The tragedy cast a spotlight on a heated debate: Do tigers have any place in live shows?");

Vegas Tiger Attack Inevitable?, CBS News, Oct. 6, 2003 (Exh. 8) ("With a wild animal, it's never tamed, it's never trained, it's never domesticated"); J. Michael Kennedy, Senate passes big-cat bill, LOS ANGELES TIMES, Nov. 18, 2003 (Exh. 9) (reporting on U.S. Senate bill to regulate trade in big cats in response to " the mauling of tiger trainer and illusionist Roy Horn"); Brian T. Murray, AR-News: (NJ) Attack shines light on use of wild animals, STAR LEDGER, Oct. 9, 2003 (Exh. 10) ("a national debate continued over the private ownership of exotic animals"); Wild animal ban right step for state, SEATTLE POST-INTELLIGENCER, Feb. 12, 2004 (Exh. 11) ("Lions and tigers and bears mix poorly, even dangerously with people. The Legislature should recognize reality and ban ownership of many wild animals").

13. Audience members, employees of Siegfried & Roy, and those knowledgeable about exotic animals provided information to the public as to the cause of this event and whether this and similar animal attacks could have been prevented. See, e.g. Transcript CNN Larry King Live, CNN.COM, Oct. 6, 2003 (Exh. 12) (roundtable of speakers discussing the attack, including an audience member, Siegfried & Roy employee, and Jack Hanna); Siegfried and Roy: Stage Fright, READERS DIGEST, April 2004 (Exh. 13) (information was provided by witnesses and crew).

14. The Siegfried & Roy incident raised questions as to why the USDA did not exercise its authority to prevent this event and to ensure that the wild animals exhibited in he act did not pose a risk to members of the audience when it had inspected the facility on numerous occasions. See, e.g., Roy Horn Tiger Mauling Case Closed, CBS NEWS, June 28, 2005 (Exh. 14) ("It is not clear why the USDA did not advise the company earlier about erecting a barrier. The agency conducted at least four routine inspections at the Mirage since mid-December").

15. The USDA's investigation of the Siegfried & Roy event also drew close scrutiny from members of Congress. <u>National Briefing, West: Nevada: Officials To View Tiger Attack Tape</u> NEW YORK TIMES, Sept. 15, 2004 (Exh.15); <u>Horn Attack Video Quest Quashed</u>, ASSOCIATED PRESS, Sept. 15, 2004 (Exh. 16).

16. On July 14, 2005, after APHIS closed its investigation of Siegfried & Roy, APHIS released portions of the investigation report to PETA. Letter from Lesia Banks to Lisa Wathne (July 14, 2005) (Exh. 17); Kettler Decl. ¶ 19; Answer ¶ 17.

17. The USDA's final report concluded that Siegfried & Roy had violated AWA regulations by failing to provide a barrier between the audience and the stage where the tiger performed, and by not having adequate control of the tiger during the performance. Excerpts, U.S. Department of Agriculture, Animal Plant Heath Inspection Service, <u>Report of Investigation</u> (Sept. 28, 2004) (Exh. 18) at 3. As frequently happens, the USDA did not impose any sanction on the company. <u>See</u> <u>Roy Horn Mauling Case Closed</u>, <u>supra</u> (Exh. 14).

18. In its response to PETA's FOIA request, APHIS withheld in their entirety under Exemptions 6 and 7(C) of the FOIA three supporting affidavits that the USDA obtained from witnesses, including an affidavit from a witness to the attack, an affidavit form a USDA veterinarian, and an affidavit from the Deputy Administrator of the Animal Care Division. July 14, 2005 Banks Letter, <u>supra</u> (Exh. 17); <u>see also</u> Letter from Lori Kettler to Administrator (Sept. 7, 2005) (Exh. 19); Answer ¶ 17.

19. This was the first time in many years that plaintiff has been requesting investigatory material from the USDA that the USDA withheld such material in its entirety. Kettler Decl. ¶ 16. The USDA also withheld in its entirety an audio-recording of a witness's

telephone call to the USDA.  Sept. 7, 2005 Kettler Letter, supra (Exh. 19); Answer ¶ 17.

20.     On September 7, 2005, plaintiff appealed APHIS' denial of its FOIA request. Sept. 7, 2005 Kettler Letter, supra (Exh. 19); Answer ¶ 17.  Plaintiff explained that there was a tremendous public interest in information concerning this high-profile investigation.  Sept. 7, 2005 Kettler Letter, supra (Exh. 19).  Plaintiff further explained that withholding all of the witness statements in full was not necessary to protect any potential privacy interests at stake, since any personal information about the affiants could simply be redacted, and the rest of the information concerning the details of the incident could be released.  Id.

21.     On May 17, 2006 plaintiff filed this case challenging the agency's withholdings, except for the names and other personal identifying information concerning private individuals. Plaintiff's First Amended Complaint ("Complaint") ¶ 1.  Two months later, on July 17, 2006, the USDA released the written affidavits, but redacted the names and personal identifying information of private citizens and federal employees. See Letter from Ron De Haven to Lori Kettler (undated) (Exh. 20).  Prior to Mr. Horn's attack, the USDA was aware that seats for the public were within four feet of the area in which the tigers walked on the stage.  Affidavit of Richard H. Watkins (Jan. 22, 2004) (Exh. 21).

22.     The agency continued to withhold the audio-recording of a witness's statement to the USDA, in its entirety, under Exemptions 6 and 7(C).  De Haven Letter, supra (Exh. 20).

23.     In February 2004, two African elephants in the custody of the Culpepper & Merriweather Circus, named Connie and Barbara, died suddenly within weeks of each other, with no cause given by the circus.  Excerpt, U.S. Department of Agriculture, Animal & Plant Health Inspection Service, Report of Investigation (Feb. 14, 2005) (Exh. 22).

24. On numerous occasions, Culpepper & Merriweather was cited by the USDA for its failure to provide adequate veterinary care to the elephants and for violations of other requirements of the AWA.  See, e.g., Bryan Clapper, Elephants vanish before main circus show, July 29, 2004 (Exh. 23); PETA Fact Sheet: Culpepper & Merriweather Circus (June 5, 2006) (listing history of Culpepper & Merriweather Circus AWA violations) (Exh. 24); Jeremy Berzon, 2 Elephants Are Scratched From Billing: A Circus Sends its Big Stars to Arizona for Behavior Training After They Got Loose In Yucca Valley THE PRESS-ENTERPRISE, April 22, 2000 , B01 (Exh. 25) ("circus employee trying to get the elephant back under control was trampled").

25. On approximately June 18, 2004, plaintiff asked the USDA to investigate the cause of Connie and Barbara's deaths.  USDA, APHIS, Animal Care, Animal Welfare Complaint (June 23, 2004) (Exh. 26).  On June 28, 2005 plaintiff submitted a FOIA request seeking records related to the investigation in an effort to uncover exactly what happened to the elephants and whether the USDA had issued any sanctions against the company.  See Letter from Hanna Schein to Lesia Banks (April 6, 2005) (Exh. 27); see also Kettler Decl. ¶ 4; see also Answer ¶ 16 ("[d]efendant admits that Plaintiff submitted a FOIA request on June 28, 2005").

26. On December 6, 2005, after closing its investigation, APHIS released the investigation report to PETA.  Letter from Lesia Banks to Hannah Schein (Dec. 6, 2005) (Exh. 28); Answer ¶ 13 (admitting that "[o]n December , 2005, once the USDA closed its investigation of the circus, the USDA responded to PETA's FOIA request" and that "USDA withheld ten witness affidavits in full").  APHIS concluded in that report that the circus had violated AWA regulations by exhibiting animals at an unlicenced facility and by failing to notify the USDA of a change of address.  Culpepper & Merriweather Report, supra (Exh. 22) at 3-4.   One APHIS

official had "questions about whether there was adequate veterinary care" provided to the elephants.  See Email from Denise M. Sofranko to Ray Flynn (March 5, 2004) (Exh. 29).

27.     The USDA did not find any violations of law, or impose any penalty on the company, in relation to the elephants' deaths.  Culpepper & Merriweather Report, supra (Exh. 22) at 3-4.

28.     APHIS withheld from plaintiff all ten of the affidavits attached to the investigation report concerning Culpepper & Merriweather, which were obtained from witnesses, inspectors, and investigators.  Dec. 6, 2005 Banks Letter, supra (Exh. 28); Kettler Decl. ¶ 18; Answer ¶ 13.  The USDA claimed these records were exempt from disclosure in their entirety under Exemptions 6 and 7(C) of the FOIA.  Dec. 6, 2005 Banks Letter, supra (Exh. 28); Answer ¶ 13.  Since these affidavits contained most of the substantive information in APHIS' investigation report, release of the report in its redacted form revealed little about what happened to Connie and Barbara and whether the agency had agreed to settle the case.  Kettler Decl. ¶ 18.

29.     On January 18, 2006, plaintiff appealed the denial of its FOIA request.  Letter from Lori Kettler to Administrator (Jan. 18, 2006) (Exh. 30).  Although PETA agreed that the names and personal identifying information of private individuals could be withheld, it challenged APHIS' decision to withhold the remainder of the affidavits.  Id.

30.     On July 17, 2006, after plaintiff this lawsuit, the USDA released the witness statements to plaintiff, except for the names and identifying information of private citizens and federal employees.  Letter from Ron DeHaven to Lori Kettler (Exh. 31).  The released information revealed that at least one USDA inspector was aware that one of the elephants had died unexpectedly, and that another elephant was housed at the facility, but the inspector did not

take any steps to protect the other elephant. Affidavit (Sept. 2, 2004) (Exh. 32).

31. Additional material that APHIS released on November 2, 2006 revealed that the agency had settled with the company for only $ 500, for the company's failure to notify the USDA of a change of address. See Letter to USDA, APHIS (April 21, 2005) (Exh. 33).

32. In September 2004, PETA filed a complaint requesting that the USDA investigate an ammunitions company, Law Enforcement Military Ammunition Sales ("Le Mas"), because a promotional video distributed by the company depicted employees killing and maiming hogs to demonstrate the efficacy of the company's bullets for U.S. military and law enforcement agencies. Letter from Lori Kettler to Robert Gibbens (September 20, 2004) (Exh. 34). According to PETA's complaint, the company violated the AWA by failing to minimize the animals' suffering and by engaging in military "research," when the company was neither licensed by, nor registered with, the USDA for this purpose. Id.

33. The issue of inhumane military animal testing has been a controversial issue. See Bryn Nelson, Science At A Price, NEWSDAY, Sept. 27, 2004 (Exh. 35) (since the AWA was passed, "questions have been brewing, not only of how research should be conducted, but also of whether some should be conducted at all"); see also, e.g., Suzanne E. Roy, Mauled by '60 Minutes' - January 24, 1993 Misleading "Animal Rights' Segment (Exh. 36) (discussing controversial military study in which scientists shot cats to study brain functions).

34. PETA's complaint to the USDA explained that Le Mas violated the AWA's requirement that facilities seeking to engage in research involving animals must either obtain a license from or register with the USDA under the Act. 7 U.S.C. § 2136. Sept. 20, 2004 Kettler Letter, supra (Exh. 34).

35. On August 15, 2005, plaintiff submitted a FOIA request seeking a copy of the investigation report for this incident. Letter from Lori Kettler to Andrea Fowler (Aug. 15, 2006) (Exh. 37); Answer ¶ 19. After the USDA closed the investigation, APHIS released to PETA portions of its final report. Letter from Lesia Banks to Lori Kettler (Jan. 12, 2006) (Exh. 38); Answer ¶ 20.

36. A settlement agreement between APHIS and Le Mas revealed that the company violated eight AWA regulations in connection with these activities – including by "physically abus[ing] hogs while conducting research," and by failing to "comply with the regulations in the humane handling, care and treatment of animals." USDA, Investigative and Enforcement Services, Settlement Agreement (undated) (Exh. 39).

37. The USDA offered to settle the entire case if Le Mas paid a penalty of $ 2,750. Id. APHIS again withheld from PETA two affidavits of USDA investigators, claiming that these records were exempt under FOIA Exemptions 6 and 7(C). Kettler Decl. ¶ 20; see also Letter from Lesia Banks to Lori Kettler (Jan. 12, 2006); Answer ¶ 20.

38. PETA is concerned that the USDA's minimal penalty would not deter future abuse of the animals at this facility. Kettler Decl. ¶ 11. Plaintiff attempted to uncover where the events depicted on the video had occurred, so that it could inform local law enforcement of the abuse and urge those officials to take appropriate action under the applicable state anti-cruelty laws. Id. PETA nevertheless approached prosecutors and requested that these officials institute their own investigations of the acts. Id. However, this effort was unsuccessful due to the USDA's withholding of the two affidavits. Id.

39. Le Mas claimed that the events took place in Arkansas. See PETA: Bullet maker

tested ammo on pigs THE SEATTLE TIMES, March 3, 2006 (Exh. 40).  Without official acknowledgment of this fact by the USDA, PETA was unable to confirm the location.  Kettler Decl. ¶ 11.

40.     On February 16, 2006, PETA appealed the USDA's withholding of the investigators' affidavits in their entirety.  Letter from Lori Kettler to Administrator (Feb. 16, 2006) (Exh. 41).  PETA explained that the significant public interest in uncovering all of the basic facts related to the USDA's investigation of Le Mas far outweighed any potential privacy interests involved, especially since all of the non-personal factual information that must be contained in the statements could be segregated and released without causing an "unwarranted invasion of personal privacy interests" under either Exemptions 6 or 7(C) of the FOIA.  Id.

41.     On July 17, 2006, after this lawsuit was filed, the USDA released the bulk of the substantive information from the two affidavits.  Declaration of Lesia Banks ("Banks Decl.") ¶ 13.  The USDA continued to withhold the location of the shootings portrayed in Le Mas' promotional video.  Affidavit (Feb. 25, 2005) (Exh. 42); Affidavit (Feb. 25, 2005) (Exh. 43).

42.     In November 2004, PETA released to the public video footage showing the routine and gruesome slaughter procedures employed at Agriprocessors, the largest certified kosher slaughter facility in the world.  See also Aaron Gross, When Kosher Isn't Kosher, TIKKUN MAGAZINE, March/April 2005, Vol. 20, No. 2 (Exh. 45).

43.     The video shows fully conscious cattle having their trachea and esophagi ripped out, despite the presence of ten USDA inspectors on-site who apparently did nothing to stop these practices.  Id.  The video generated a great deal of public debate, as many questioned whether such practices were "kosher," and whether they were humane under the HSA.  See, e.g.,

Donald G. McNeil Jr., <u>Inquiry Finds Lax Federal Inspections at Kosher Meat Plant</u>, N.Y. TIMES, March 10, 2006 (Exh. 46) ("The scene caused a furor among Jewish communities around the world"); Adam Frank, <u>The First Word: When 'kosher' slaughter is not Jewish</u> JERUSALEM POST, March 30, 2006 (Exh. 47) ("This horrible act, which has now been declared in violation of US animal cruelty laws, is not a necessary part of the shehita process"); Gross, <u>supra</u> (Exh. 45) ("at stake" in the controversy is the "basis of Jewish dietary law").

44. In response, the USDA Office of Inspector General launched an investigation into whether Agriprocessors violated the HSA by engaging in the slaughter procedures documented by PETA's video. Excerpt, U.S. Department of Agriculture, Office of Inspector General - Investigations, <u>Report of Investigation</u> (April 25, 2005) (Exh. 48).

45. On October 26, 2005, PETA submitted a FOIA request to the USDA's Office of Inspector General seeking a copy of the agency's final report of investigation. Email from Lori Kettler to Ms. MacNeal (Oct. 26, 2005) (Exh. 49); Answer ¶ 22. PETA's purpose was to uncover the extent of the legal violations involved and whether the USDA had imposed any sanctions on the company or the USDA inspectors. Kettler Dec. ¶ 4.

46. On February 1, 2006, OIG closed the investigation. MacNeil Decl. ¶ 23. On February 28, 2006, the OIG released its final investigation report. Letter from Deirdre MacNeil to Lori Kettler (Feb. 28, 2006) (Exh. 50). OIG concluded that Agriprocessor employees engaged in "acts of inhumane techniques" by "dressing" animals, <u>i.e.</u>, pulling out the animals' trachea and esophagi, before the animals were "unconscious," and therefore insensible to pain. Agriprocessors Report at 2, <u>supra</u> (Exh. 48). The OIG also found that "[USDA] employees observed the acts of inhumane slaughter and did nothing to stop the practice." <u>Id</u>. It further

found that "[USDA] inspectors accepted meat products from [Agriprocessors] employees . . . and engaged in other acts of misconduct." Id. (emphasis added).

47. According to news reports, OIG did not take any legal action against the slaughter facility. Orlan Love, Meat Plant Violated Cruelty Laws THE GAZETTE, March 11, 2006 (Exh. 51). The OIG also suspended one inspector for fourteen days and only issuing warning letters to two others. See McNeil, supra (Exh. 46). Members of the public questioned whether these penalties were sufficient in light of the serious evidence of employee misconduct. See, e.g., Love, supra (Exh. 51); Christopher Doering, USDA Finds Misconduct by Inspectors in Kosher Plant REUTERS (Exh. 52).

48. OIG withheld from PETA five sworn statements and eight memoranda of interviews obtained from Agriprocessor employees, USDA inspectors, and USDA investigators. See MacNeil letter, supra (Exh. 50); Agriprocessors Report (Exh. 48) at 13. In keeping with the practice employed by other components of the USDA, OIG redacted all of the information contained in these statements on the ground that every word could be withheld on privacy grounds – albeit the OIG cited the Privacy Act instead of the FOIA. Id.; see also Mac Neil Decl. ¶ 27 ("I withheld 13 witness statements pursuant to the Privacy Act")

49. On March 24, 2006, PETA appealed the USDA's denial of its FOIA request. Letter from Lori Kettler to Inspector General (March 24, 2006) (Exh. 53); Answer ¶ 23. PETA explained that agencies may not legally withhold information that is requested under the FOIA based on the Privacy Act, but instead must demonstrate that such information is exempt from disclosure under the FOIA. Id.

50. After plaintiff filed this lawsuit the USDA release the statements, without the names

and personal identifying information of private citizens and federal employees.  Kettler Decl. ¶ 24.  The released information recounted that a USDA inspector witnessed Agriprocessor employees "skinning heads" of cattle while the animals appeared to be conscious, and that the same inspector also witnessed animals still standing, after their throats had been cut.  See Exhibit 13 to Agriprocessors Report, Sworn Statement 5 (Dec. 7, 2004) (Exh. 54).  The statements also revealed that a Senior Veterinary Medical Officer was not trained in the requirements of religious slaughter, and that one inspector engaged in other misconduct.  See Exhibit 6 to Agriprocessors Report, Memorandum of Interview 3 (undated) (Exh. 55); see also Exhibit 12 to Agriprocessors Report, Sworn Statement (Dec. 8, 2004) (Exh. 56).

       51.     The USDA redacted from the statements all references to these federal inspectors, invoking Exemptions 6 and 7(C).  Exh. 4 to Def. Mem.

       52.     On May 17, 2006, plaintiff filed this lawsuit to obtain all of the material the USDA improperly withheld under the FOIA, with the exception of names and personal identifying information of private citizens.  (Complaint ¶ 1).  In addition, plaintiff challenged under the APA the USDA's new pattern and practice of withholding witness statements in full. Id.

       53.     The attack on Roy Horn triggered a nationwide debate concerning the cause of the Siegfried & Roy incident, the USDA's role in regulating this and similar facilities, and whether the entertainment industry should be permitted to exhibit exotic animals at all.  See, e.g., National Briefing supra (Exh. 15); Siegfried: Tiger wanted to help Roy, CNN, October 9, 2003 (Exh. 57); Doctor calls Roy's survival 'all but miraculous', REVIEW JOURNAL, October 08, 2003 (Exh. 58); Roy Horn Tiger Mauling Case Closed, supra (Exh. 14) ("It is not clear why the USDA

did not advise the company earlier about erecting a barrier.  The agency conducted at least four routine inspections at the Mirage since mid-December.").

54.    In the past, the USDA has offered to edit videotapes that are requested under FOIA in a way would distort the images of private individuals to protect their personal privacy, but allow the agency to comply with its obligation to release all non-exempt segregable information.  See, e.g., Letter from USDA (March 27, 2002) (Exh. 59).

55.    Sound technology can be easily downloaded from the internet at no cost to the agency.  See, e.g., http://3d2f.com/download/42-521-av-voice-changer-gold-free-download.shtml (web site offering free downloadable voice changing software).

56.    Both APHIS and the OIG initially withheld witness affidavits and statements in their entirety in response to PETA's FOIA requests at issue in this case.  Answer ¶¶ 13, 17, 20, 22.

57.    Documents released by the USDA after this suit was filed show that, during the administrative phase, the USDA withheld from PETA significant amounts of non-personal factual information that it deleted from witness statements and affidavits.  See, e.g.,Watkins Affidavit, supra (Exh. 21) (stating that "[o]n October 30, 2003, Animal Care conducted a Big Cat Workshop at Sam's Resort in Henderson, NV"); id. ("[t]he stage area is a standard stage with an estimated 8 foot wide half circle walkway that arcs through the viewing public").

58.    On March 15, 2006, APHIS held a meeting with several animal protection groups.  See Declaration of Kathleen Conlee (Dec. 5, 2006) (Attachment 2); see also Declaration of Suzanne Roy (Dec. 5, 2006) (Attachment 3); Declaration of Debbie Leahy (Dec. 6, 2006) (Attachment 4).  According to several individuals who attended this meeting, APHIS announced

that it had received "guidance" and been "advised" by the agency's Office of General Counsel to withhold witness affidavits from the public because such records should be protected by the privacy exemptions of the FOIA. See Conlee Decl. ¶ 3; Roy Decl. ¶ 3.

59. Debbie Leahy, Director of Captive Animals & Entertainment Issues at PETA, was also present at the meeting. Leahy Decl. ¶ 2. Ms. Leahy specifically inquired as to why APHIS was now withholding all such information, when this had not previously been APHIS' practice. Id. ¶ 3. Ms. Banks responded by explaining that she had "changed" several practices put in place by her predecessor, and that now, "under her direction," APHIS "redacted entire witness affidavits because it felt that employees of entities licensed by the USDA who were targets of investigations were more likely to speak freely to USDA investigators if they knew that their employers would not be able to read their statements." Id. ¶ 4, 6.

**II.     Plaintiff's Response to Defendants' Statement of Material Facts As To Which There is No Genuine Issue.**

1. Plaintiff does not dispute this paragraph.

2. Plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

3. Plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

4. Plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

5. Plaintiff does not dispute this paragraph.

6. Plaintiff does not dispute this paragraph.

7. Plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

8. Plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

9. Plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

10. Aside from the last sentence of this paragraph, which plaintiff does not dispute, plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

11. Aside from the last sentence of this paragraph, which plaintiff does not dispute, plaintiff does not have sufficient information to admit or deny the assertions made in this paragraph.

12. Plaintiff does not dispute this paragraph.

13. Plaintiff does not dispute this paragraph.

14. Plaintiff does not dispute this paragraph.

15. Plaintiff does not dispute this paragraph.

16. Plaintiff does not dispute this paragraph.

17. Plaintiff does not dispute this paragraph.

18. Plaintiff does not dispute this paragraph.

19. Plaintiff does not dispute this paragraph.

20. Plaintiff does not dispute this paragraph.

21. Plaintiff does not dispute this paragraph.

22. Plaintiff does not dispute this paragraph.

23. Plaintiff does not dispute this paragraph.

24. Plaintiff does not dispute this paragraph.

25. Plaintiff does not dispute this paragraph.

                                    Respectfully submitted,

                                    /s/ Erin M. Tobin
                                  Erin M. Tobin
                                  (D.C. Bar No. 494948)
                                  Katherine A. Meyer
                                  (D.C. Bar No. 244301)
                                  Meyer Glitzenstein & Crystal
                                  1601 Connecticut Ave. N.W., Suite 700
                                  Washington, D.C. 20009
                                  (202) 588-5206
                                  (202) 588-5049 fax

Date:  December 6, 2006                 Attorneys for Plaintiff