Civ. Action No. 06-930 (RMC)


*EXCERPTS*


EXHIBIT 4

# BY THE U.S. GENERAL ACCOUNTING OFFICE

## Report To The Chairman, Subcommittee on Agriculture, Rural Development and Related Agencies Committee On Appropriations United States Senate

## The Department Of Agriculture's Animal Welfare Program

Under the Animal Welfare Act, the Department of Agriculture inspects sites that handle certain warm-blooded animals to ensure their humane care and treatment. GAO obtained information in six states on the (1) training and guidance given to Agriculture's inspectors, (2) frequency of inspections, and (3) follow-up actions on deficiencies found during inspections.

In general, inspectors received on-the-job training and written guidance consisting of regulations setting forth standards for the humane handling, care, treatment, and transportation of animals. For the 3,379 sites in the six states, inspections in fiscal year 1983 occurred 1.7 times on average. Individually, the frequency varied considerably, and many sites (829) were not inspected during the year. Agriculture's field offices were generally following up on deficiencies noted during inspections.

The administration's 1986 budget proposes elimination of the program. If the Congress decides to continue the program, it should consider requiring the Secretary of Agriculture to recover more of the cost of the program from licensees.





127002

**GAO/RCED-85-8**
**MAY 16, 1985**

032100 /127002

Request for copies of GAO reports should be sent to:

U.S. General Accounting Office
Document Handling and Information
    Services Facility
P.O. Box 6015
Gaithersburg, Md. 20877

Telephone (202) 275-6241

The first five copies of individual reports are free of charge. Additional copies of bound audit reports are $3.25 each. Additional copies of unbound report (i.e., letter reports) and most other publications are $1.00 each. There will be a 25% discount on all orders for 100 or more copies mailed to a single address. Sales orders must be prepaid on a cash, check, or money order basis. Check should be made out to the "Superintendent of Documents".



**UNITED STATES GENERAL ACCOUNTING OFFICE**
WASHINGTON, D.C. 20548

RESOURCES, COMMUNITY,
AND ECONOMIC DEVELOPMENT
DIVISION

B-217624

The Honorable Thad Cochran
Chairman, Subcommittee on Agriculture,
  Rural Development and Related Agencies
Committee on Appropriations
United States Senate

Dear Mr. Chairman:

As requested in your September 1, 1983, letter and subsequent discussions with your office, this report discusses the Department of Agriculture's Animal Welfare Program.

As arranged with your office, we are sending copies of this report to the Director, Office of Management and Budget; appropriate congressional committees and subcommittees; and the Department of Agriculture.

Sincerely yours,

J. Dexter Peach
Director

GENERAL ACCOUNTING OFFICE
REPORT TO THE SUBCOMMITTEE ON
AGRICULTURE, RURAL DEVELOPMENT
AND RELATED AGENCIES
COMMITTEE ON APPROPRIATIONS
UNITED STATES SENATE

THE DEPARTMENT OF AGRICULTURE'S
ANIMAL WELFARE PROGRAM

D I G E S T

The Animal Welfare Act (7 U.S.C. 2131 et seq.)
authorizes the Department of Agriculture
(USDA) to inspect the premises of animal deal-
ers, research facilities, exhibitors (such as
zoos and circuses), and carriers and handlers
to ensure the humane care and treatment of
animals.  (See p. 1.)

Annual appropriations for the program were
about $4.9 million in fiscal years 1982-85.
Licensees paid fees of about $143,000 in fis-
cal year 1983 (the latest data available), or
about 3 percent of the funds appropriated for
the program.  Fees are based on the volume of
business or number of animals held, depending
on a licensee's business.  (See pp. 1 and 3.)

The Chairman of the Subcommittee on Agricul-
ture, Rural Development and Related Agencies,
Senate Committee on Appropriations, asked GAO
to study USDA's activities under the Animal
Welfare Act.  As agreed with the requester's
office, GAO focused its work on obtaining in-
formation on

--the training and guidance given to USDA's
  inspectors,

--how USDA schedules its inspections of
  licensees and registrants and the frequency
  of those inspections, and

--the follow-up action USDA takes when inspec-
  tors find unsatisfactory conditions.  (See
  p. 3.)

In addition, GAO also obtained information on
how

--USDA officials monitor the quality of
  inspections,

--inspection statistics are collected for
  reporting purposes, and

--available funding is allocated among area
offices. (See p. 33.)

GAO reviewed animal welfare inspection activi-
ties at the Animal and Plant Health Inspection
Service's area offices in California, Iowa,
Kansas, Missouri, New York, and Texas. These
offices were selected because they represented
6 of the 10 states that had the most inspec-
tions of licensees and registrants--45 percent
of the 19,473 inspections made in fiscal year
1982. (See p. 4.)

## TRAINING AND WRITTEN
## GUIDANCE FOR INSPECTORS

According to area office officials and inspec-
tors, the written guidance for the inspectors
comes primarily from animal welfare standards
in the Code of Federal Regulations, and the
training is through formal training courses,
on-the-job training, and periodic work con-
ferences. In recent years, on-the-job train-
ing has been the main type of training. (See
pp. 8 and 14.)

GAO reviewed the training records of 73 in-
spectors in six states and found that 57 of
them had attended formal training courses,
while the others had not. For example, 9 of
the 23 inspectors in Texas had not attended
any animal welfare training courses. However,
of those who had attended training courses, 43
had not done so in recent years. For example,
the latest training courses for the 17 inspec-
tors in Texas were given in 1979. (See
p. 8.)

In addition, GAO obtained the views of 11
regional and area office officials and 29 in-
spectors about the adequacy of the training.
About half of the officials said that the
training was not adequate, while others said
that it was adequate only because the inspec-
tors in their offices were experienced.
Twenty-one of the 29 inspectors said that
their training was adequate but 8 of these
expressed reservations. For example, three
inspectors said that the training was adequate
because they already had experience working
with animals and three others said that they
still wanted more. (See p. 16.)

ii

GAO also obtained comments from 7 regional and area office officials and 19 inspectors about the adequacy of guidance provided. Fifteen of these officials and inspectors said that the written guidance was not adequate, the most common reason being that the standards are too broad and require a great deal of interpretation. Of the 11 officials and inspectors who believed that the guidance was adequate, 6 said, however, that the standards were broad and required a great deal of judgment. (See p. 16.)

## FREQUENCY OF INSPECTIONS

The Service does not have a formal system for scheduling inspection visits. However, program personnel GAO interviewed and planning documents stated that a desired level for an effective program was 4 inspections per year. The inspectors are required to reinspect sites with major deficiencies (those that would usually constitute a health or safety hazard to the animals involved, such as animals in obvious need of veterinary care or enclosures in an advanced state of structural disrepair) to determine corrective action taken. The inspectors also receive general guidance as to how often sites can be inspected with available funds. The inspectors told GAO that they schedule visits based on their judgment and knowledge of the sites, generally planning to make more frequent visits to sites that have problems. (See pp. 21 and 24.)

GAO found that the 3,379 sites in the six states were inspected, on average, 1.7 times during fiscal year 1983. However, the average frequencies in each of the six states visited varied greatly, from a low of 0.7 in California and New York, to a high of 2.4 in Iowa and Kansas. (See p. 20 and app. I.)

Many sites were not inspected at all during fiscal year 1983--51.7 percent in California, 48.7 percent in New York, 22.0 percent in Missouri, 13.0 percent in Texas, 10.0 percent in Iowa, and 6.4 percent in Kansas. The California area office officials said that the office did not obtain sufficient funds to do more inspections. Officials of the New York area office also said that the office did not have enough inspectors to make more inspections. (See p. 22.)

## FOLLOW-UP ON DEFICIENCIES

The Inspection Service's policy requires that deadlines be set for correcting major deficiencies found and that reinspections be made within 30 days after the deadline date. If the deficiencies have not been corrected at the time of reinspection and the deadlines have not been extended, the area offices are to prepare apparent violation cases that are sent to Service headquarters. Headquarters reviews the cases and either sends a letter of warning, takes no action for reasons such as lack of evidence, or forwards the case to the Department's Office of General Counsel with a recommendation for prosecution. (See p. 27.)

The inspection reports reviewed by GAO included 114 sites where major deficiencies were found during inspections. GAO found that the Inspection Service's offices generally complied with the Service's policy and met the time frame goals for the various steps in the process. There were three sites, however, where deadline dates were not established, eight sites where required reinspections were not made within 30 days of the deadline date, three sites where reinspections were not made at all, and three sites where the area offices did not prepare apparent violation cases when uncorrected deficiencies were found during a reinspection. (See p. 29 and app. IV.)

## MATTERS FOR CONSIDERATION BY THE CONGRESS

Officials told GAO that the funding level for the Animal Welfare Program has affected the extent of training given to inspectors and the frequency of inspections of regulated sites. Agriculture proposed for fiscal years 1983, 1984, and 1985 that funding for inspections be reduced or eliminated and that nonfederal (state, local, and private) entities take on more responsibility for enforcing animal welfare regulations. The Congress, however, has continued to fund the program at about the same level as in prior years. The President's fiscal year 1986 budget proposes elimination of the program.

The ultimate decisions as to the extent of the federal role in animal welfare enforcement and the appropriate level of funding for the federal role will have to be made by the Congress.

If the Congress decides to continue funding the
program, it should consider requiring the
Secretary of Agriculture to recover more of
the cost of the program from licensees. (See
p. 33.)

## OTHER PROGRAM ADMINISTRATION MATTERS

GAO noted, during its review, some additional
matters affecting the program. These relate to
(1) how USDA officials monitor the quality of
inspections, (2) inspection statistics col-
lected for reporting purposes, and (3) how
available funding is allocated among area
offices. Although GAO did not examine these
matters in depth, it is presenting the infor-
mation since these topics should be useful in
future assessments of the program.

### Monitoring inspection quality

The Health Inspection Service has assigned re-
sponsibility for overseeing the quality of in-
spections to designated area office personnel
but has not specified a system or procedure for
carrying out this responsibility. Two of the
six area offices GAO visited had programs to
monitor inspection quality that were also used
to provide on-the-job training to inspectors.
The quality of inspections in a third area
office was monitored by a regional office under
a program that also combined monitoring with
on-the-job training. The other three area
offices did not have programs for monitoring
inspection quality. (See p. 34.)

### Inconsistent reporting of inspections

Area offices collect inspection statistics and
submit them to Service headquarters for its use
in management activities and the Service's
annual report to the Congress. The area of-
fices computed inspection results in different
ways, making the results not comparable. GAO
also noted that the reported statistics did not
agree with the number of inspections shown in
the area office records. For example, the
California area office reported that it had
made a total of 624 inspections for fiscal year
1983, which was 24 percent more than the
numbers shown in the office's inspection
records. (See p. 38.)

Funding of inspection activities

The Service restricted animal welfare inspec-
tions during much of fiscal year 1983 because
it believed some available funds might have to
be used in some of its other programs.  When
additional funds were released in June, it was
too late in the fiscal year to use all of them
to conduct animal welfare inspections.  The way
in which the Inspection Service allocated 1983
funds among its area offices--based on 1982
work levels rather than making adjustments for
estimated current potential workloads and
severity of expected problems--contributed to
the differences in inspection frequencies among
the area offices.  (See p. 41.)

AGENCY COMMENTS

In commenting on this report, USDA said that
the Animal and Plant Health Inspection Service
generally agreed with GAO's findings.  It said
that the source of the problems GAO identified
and their eventual resolution are directly re-
lated to organizational structure and lines of
communication.  USDA said that the program was
reorganized just prior to GAO's work, and it
is confident that many of the problems that
existed during GAO's work have been or are
being resolved.  In general, the actions cited
by USDA address the concerns raised by GAO in
its review of this program.  (See pp. 18, 25,
32, and 43.)

vi

# C o n t e n t s

|  |  | Page |
|---|---|---|
| **DIGEST** | | i |
| **CHAPTER** | | |
| 1 | INTRODUCTION | 1 |
| | USDA's Animal Welfare Program | 1 |
| | Funding for animal welfare | 3 |
| | Objectives, scope, and methodology | 3 |
| 2 | TRAINING AND WRITTEN GUIDANCE FOR INSPECTORS | 7 |
| | Animal welfare inspection staff | 7 |
| | Training given to inspectors | 8 |
| | Written guidance | 14 |
| | Opinions of APHIS animal welfare personnel on adequacy of training and guidance | 16 |
| | Agency comments | 18 |
| 3 | FREQUENCY AND SCHEDULING OF INSPECTIONS | 20 |
| | Frequency of site inspections during fiscal year 1983 | 20 |
| | Sites not inspected during fiscal year 1983 | 22 |
| | Scheduling of inspections | 24 |
| | Agency comments | 25 |
| 4 | ACTIONS TAKEN TO FOLLOW UP ON DEFICIENCIES FOUND DURING INSPECTIONS | 27 |
| | APHIS procedures for acting on deficiencies found during inspections | 27 |
| | Follow-up by area offices on reported deficiencies | 29 |
| | Disposition of violation cases submitted by area offices | 31 |
| | Conclusions | 32 |
| | Agency comments | 32 |
| 5 | MATTERS FOR CONSIDERATION BY THE CONGRESS AND OBSERVATIONS ON PROGRAM ADMINISTRATION MATTERS | 33 |
| | Matters for consideration by the Congress | 33 |
| | Monitoring of inspection quality | 34 |
| | APHIS' reported inspection statistics | 38 |
| | Funding restrictions and budgeting in fiscal year 1983 | 41 |
| | Agency comments | 43 |

Page

APPENDIX

I       Schedule showing frequency of inspections
        and number of sites not inspected for
        the six area offices we reviewed fiscal
        year 1983                                              45

II      Statistics on sample of inspection
        reports reviewed to determine APHIS'
        follow-up actions on deficiencies
        July 1, 1982 through June 30, 1983                     48

III     Summary of animal welfare standards                   50

IV      Follow-up actions by six area offices on
        reported deficiencies in follow-up sample             54

V       Letter dated March 13, 1985, from the Acting
        Assistant Secretary, Marketing Services,
        Department of Agriculture                              60

                    ILLUSTRATIONS

Number of active licensees and registrants in
fiscal years 1981 through 1983                                 2

Appropriations for the animal welfare program
for fiscal years 1981 through 1985                            3

Number of inspectors who worked on animal welfare
and percent of their time spent on animal welfare
inspections for six area offices during fiscal
year 1983                                                     7

Staff days spent on animal welfare training
by six area offices during fiscal years 1981
through 1983                                                  8

Average number of inspections per site for
six area offices during fiscal year 1983                      20

Percent of sites not inspected by six area
offices during fiscal year 1983                               22

Disposition of 16 violation cases acted upon
as of January 15, 1984                                        31

Relationship of funds and sites in six area
offices, fiscal year 1983                                     43

## ABBREVIATIONS

APHIS        Animal and Plant Health Inspection Service

GAO          General Accounting Office

USDA         U.S. Department of Agriculture

CHAPTER 1

INTRODUCTION

Under the Animal Welfare Act, as amended (7 U.S.C. 2131 et seq.), the U.S. Department of Agriculture (USDA) administers a program to ensure the humane care and treatment of certain warm-blooded animals. Provisions of the act apply to live or dead animals used or intended for use for research, testing, experiments, exhibition, or as a pet. The act applies to all dogs, including those used for hunting, security, and breeding purposes. The act excludes some animals such as horses not used for research purposes and other farm animals used or intended for use as food or fiber.[1]

To protect the animals, the act directs USDA to inspect facilities where the animals are kept or are temporarily handled. Research facilities, dealers, exhibitors (such as circuses and zoos), carriers (such as airlines and railroads), and intermediate handlers (entities that receive custody of animals in connection with their transportation) generally are subject to USDA regulations and inspections. In addition, dealers must be licensed by and research facilities, carriers, and intermediate handlers must register with the Secretary of Agriculture. Most exhibitors are required to be licensed, but some have the option of registering instead. The act authorized civil or criminal penalties for those who violate any provisions of the act.

USDA'S ANIMAL WELFARE PROGRAM

USDA has issued regulations setting forth the standards for the humane handling, care, treatment, and transportation of animals covered by the program. Separate standards are provided for dogs and cats, guinea pigs and hamsters, rabbits, nonhuman primates (any nonhuman members of the highest order of mammals, such as monkeys and apes), marine mammals, and other warm-blooded animals. Each of the standards covers three main types of requirements: (1) facilities and operations (covering such things as waste disposal, ventilation, lighting, shelter, and space requirements), (2) animal health and husbandry (covering such things as feeding, watering, sanitation, and veterinary care), and (3) transportation (covering such things as construction of primary enclosures, food and water requirements, and care in transit).

USDA approves an application for a license after it determines that the applicant's premises, facilities, and equipment comply with the standards and the applicant has paid the prescribed annual fee. The annual fee for dealers ranges from $5 to

_____

[1]USDA regulations (9 C.F.R. 1.1(n)) also exclude birds, rats, and mice.

1

$500, depending on volume of business. The annual fee for exhibitors ranges from $5 to $100, depending on the number of animals held. Licenses remain valid until terminated voluntarily by the licensee, revoked or suspended by USDA, or canceled automatically for failure to pay the annual fee or to file an annual report showing the licensee's volume of business or number of animals held, as appropriate. USDA collected about $143,000 in fees in fiscal year 1983 (the latest available data).

Research facilities, carriers, intermediate handlers, and certain exhibitors not required to be licensed must register with USDA. Registrations continue in effect until facilities are disbanded or merged with another registrant. Federal agencies do not have to register as research facilities, but they are required to follow USDA's standards.

The following table shows the number of active licensees and registrants for fiscal years 1981-83.

| Type | Fiscal year | | |
|------|------|------|------|
| | 1981 | 1982 | 1983 |
| Research facilities | 1,169 | 1,113 | 1,166 |
| Dealers | 3,664 | 3,439 | 3,490 |
| Exhibitors | 1,298 | 1,343 | 1,367 |
| Carriers | 115 | 124 | 125 |
| Intermediate handlers | 197 | 215 | 221 |
| Total | 6,443 | 6,234 | 6,369 |

USDA enforces the act by making unannounced inspections, called compliance inspections, at licensees' and registrants' premises to determine whether they are complying with regulations and standards. USDA also inspects facilities before issuing licenses, investigates public complaints about conditions at licensed or registered establishments, and investigates entities that may be subject to regulation to determine whether they should be licensed or registered.

The USDA organization that administers the Animal Welfare Program is Veterinary Services of the Animal and Plant Health Inspection Service (APHIS). Veterinary Services has five regional offices located in Scotia, New York; Tampa, Florida; Englewood, Colorado; Fort Worth, Texas; and Reno, Nevada; and area offices in most states.

APHIS' Veterinary Services is responsible for 19 animal health and disease programs, of which animal welfare is only a small part. For example, the $4.9 million appropriated for animal welfare in fiscal year 1983 represented 2.8 percent of the $174.7 million appropriated for APHIS' animal health programs. According

2

to USDA, the APHIS personnel who make the animal welfare inspec-
tions perform many other duties as well and only spend about 6
percent of their total time on animal welfare inspections.

## FUNDING FOR ANIMAL WELFARE

The appropriations for the Animal Welfare Program for fiscal
years 1981 through 1985 were as follows:

| Fiscal year | Amount |
|:-----------:|:------:|
|             | (millions) |
| 1981        | $4.541 |
| 1982        | 4.882  |
| 1983        | 4.865  |
| 1984        | 4.865  |
| 1985        | 4.865  |

For fiscal years 1983 and 1984, USDA requested funding of
$1.5 million and $1.6 million, respectively, and proposed to elim-
inate routine inspections of dealers, research facilities, exhib-
itors, and carriers.  USDA's stated rationale for eliminating
inspections was that it believed the states, industry groups,
humane societies, and individuals should be responsible for the
primary enforcement of animal welfare regulations.

USDA again proposed in its fiscal year 1985 budget request
that the Animal Welfare Program be reduced, although the reduction
would be smaller than those proposed for 1983 and 1984.  USDA
asked for $3.7 million, a reduction of about $1.2 million from the
1984 level.  This reduction would have been achieved by reducing
the frequency of routine inspections, under the rationale that
states, industry groups, and humane societies should take on
greater responsibility for enforcing animal welfare regulations.
As shown by the amounts appropriated, the Congress has not
accepted USDA's proposed reductions in routine inspections.

USDA's budget for fiscal year 1986 proposes that the Animal
Welfare Program be eliminated.  USDA said that, given current
fiscal restraints, it must concentrate its limited resources in
areas that will protect agriculture from pests and diseases.

## OBJECTIVES, SCOPE, AND METHODOLOGY

The Chairman of the Subcommittee on Agriculture and Related
Agencies, Senate Committee on Appropriations, asked us to conduct
a study of USDA's activities under the Animal Welfare Act.  As
agreed with the requester's office, we focused our work on
obtaining information on

--the instructions and training given to USDA inspectors,

3

--how USDA schedules its inspections of licensees and regis-
trants and selects locations to be visited and the fre-
quency of inspections, and

--the follow-up action USDA takes when its inspectors find an
unsatisfactory condition.

Evaluating the adequacy of instructions and training for any
group of employees is always a difficult task that requires sub-
jective judgments.  Because USDA has not established criteria that
set out the amount and type of instruction and training that would
be considered as adequate for animal welfare inspectors, we were
not able to reach conclusions as to the adequacy of instructions
and training.  Also, while neither the Animal Welfare Act nor USDA
has specified a required inspection frequency, we did obtain
information from APHIS' internal planning documents and APHIS'
inspection personnel on what may be considered to be a desired
frequency of inspections (see ch. 3).  We have no criteria, how-
ever, for assessing the validity of these desired frequencies.
Therefore, we did not reach any conclusions as to the adequacy of
APHIS' actual inspection frequency.

In addition, we also obtained information on (1) how USDA
officials monitor the quality of inspections, (2) the inspection
statistics reported by APHIS area offices, and (3) how available
funding is allocated among the area offices.  We did not evaluate
USDA's decisions in these areas, because it was beyond the scope
of our work.  However, we are presenting the information we
obtained for the Congress' and APHIS' use in future program
assessments.

We reviewed the Animal Welfare Act, USDA's regulations, and
APHIS documents and records on its inspection activities and
interviewed APHIS officials and inspectors.  We did most of our
work at six APHIS area offices in Sacramento, California; Des
Moines, Iowa; Topeka, Kansas; Jefferson City, Missouri; Albany,
New York; and Austin, Texas.  We selected these six offices, each
of which covers an entire state, because the six states covered by
them were among the 10 states that had the most compliance inspec-
tions and active licensees and registrants during fiscal year 1982
(the most current data available when we planned our review).
Kansas, Missouri, Texas, and Iowa were the four top states in
number of inspections while California and New York were the two
states that had the highest number of research facilities.  These
six states made up 44.7 percent of the 19,473 compliance inspec-
tions made in fiscal year 1982 and contained 40.8 percent of the
active licensees and registrants during that year.

We also examined records and interviewed officials at USDA
headquarters in Washington, D.C., and APHIS headquarters in
Hyattsville, Maryland.  We interviewed officials of the following
APHIS regional offices:  Scotia, New York; Fort Worth, Texas;
Englewood, Colorado; and Reno, Nevada.  Our examination of records

4

and interviews with APHIS personnel covered the training and guid-
ance given to inspectors, monitoring of inspection results, sched-
uling of inspections and their frequency, reasons for not inspect-
ing some facilities, impact of funding allocations, actions taken
to correct identified deficiencies at licensees and registrants,
and general program administration.

At each of the six area offices, we obtained a list of all
facilities that were licensed or registered at any time between
July 1, 1982, and September 30, 1983. We calculated, or had the
area office calculate, the number of times each site (some li-
censed or registered facilities have more than one site) was actu-
ally inspected during the period. We also tested the accuracy of
the data where the area office prepared the calculation. We used
fiscal year 1983 as the period for which we compiled data on the
frequency of inspections for each site. We used a July 1, 1982,
to June 30, 1983, period for our work on APHIS' follow-up actions
on deficiencies to minimize the possibility of selecting inspec-
tions that were too recent for APHIS to have completed its
follow-up actions.

We reviewed a random sample of inspection reports to deter-
mine what follow-up actions APHIS took on deficiencies identified
during inspections. The universe from which we drew our sample
was the list of all sites in the six area offices that had been
inspected between July 1, 1982, and June 30, 1983. We drew a
sample of 100 sites in each office--600 sites in total. We re-
viewed all inspection reports for the selected sites during the
period to identify site inspections where deficiencies were found
and determine what corrective actions were reported on follow-up
inspections.

We determined what further actions had been taken by the area
offices for the selected sites where reinspections showed that
prior deficiencies had not been corrected. We also reviewed the
actions taken by APHIS and USDA headquarters on cases that were
referred to headquarters by the area offices when they determined
that an apparent violation existed because of failure to correct
deficiencies. Because relatively few apparent violation cases
existed in our 600-site sample, we also reviewed apparent viola-
tion cases submitted by the six area offices and cases that had
violation dates during the period but were submitted later to have
a more adequate number of cases for our work at APHIS and USDA
headquarters.

In addition, we accompanied inspectors on regular inspections
of three dealers, one research facility, and one exhibitor in
three states to familiarize ourselves with the types of facilities
inspected and with APHIS' inspection procedures. We did not eval-
uate the adequacy of these particular inspections.

Because our work covered program operations in six states,
our information on training, inspection frequency, and follow up

of deficiencies is not statistically projectable nationwide.  The six states covered in our review, however, make up a large portion (almost 50 percent) of the program's total inspection activity. In discussing the results of our work with APHIS' Assistant Director, Animal Health Programs, Veterinary Services; Technical Director, Animal Health Programs, Veterinary Services; and Interstate Inspection and Compliance Staff Director, Veterinary Services, they agreed that our observations and information on program administration and funding allocations are typical of the remaining states and have programwide applications.

Except as noted above, we did our work in accordance with generally accepted government auditing standards and coordinated our work with USDA's Office of the Inspector General.

6

CHAPTER 2

## TRAINING AND WRITTEN GUIDANCE FOR INSPECTORS

Regional and area offices since fiscal year 1981 have been responsible for inspector training.  The primary method of training provided by these offices is on-the-job training.  We found that the extent of training varied considerably among the six area offices we visited.

With respect to written guidance, the inspectors are given the regulations setting forth the standards for the humane handling, care, treatment, and transportation of animals as a guide in conducting inspections of facilities.  In addition, APHIS has supplemented the regulations with memorandums providing further guidance on selected aspects of the inspection program.

Regional and area office officials had mixed views on the adequacy of the training and guidance given to inspectors.  On the other hand, most of the inspectors we interviewed said that their training had been adequate while they had mixed views on the adequacy of guidance received.

### ANIMAL WELFARE INSPECTION STAFF

APHIS' Veterinary Services area offices have two types of personnel who perform animal welfare inspections.  Veterinary medical officers generally inspect research facilities, zoos, and other large exhibitors.  Animal health technicians inspect the other types of regulated facilities.  These technicians usually work under the supervision of veterinary medical officers.

The following table shows the number of inspectors who worked on the Animal Welfare Program and their percentage of time spent on animal welfare inspections (based on our analysis of the area offices' reports on work performed) during fiscal year 1983 for the six area offices we reviewed.

| | Number of inspectors | | | |
|---|---|---|---|---|
| Area office | Veterinary medical officers | Animal health technicians | Total | Percent of time on animal welfare inspections |
| California | 11[a] | 14 | 25 | 5.7 |
| Iowa | 6 | 8 | 14 | 17.9 |
| Kansas | 9 | 8 | 17 | 25.9 |
| Missouri | 9 | 11 | 20 | 9.4 |
| New York | 4 | 3[b] | 7 | 11.1 |
| Texas | 11 | 6 | 17 | 10.7 |

[a]One of these veterinary medical officers left in February 1983 and another started in April 1983.

[b]One of these technicians was promoted in June 1983 to another position that does not involve animal welfare.

7

TRAINING GIVEN TO INSPECTORS

APHIS has no policy setting forth the amount and types of training that animal welfare inspectors should receive. According to area office officials and inspectors, training is provided to inspectors by means of formal training courses, on-the-job training, and periodic work conferences. In recent years, on-the-job training has been the primary type of training for inspectors.

During fiscal year 1981, APHIS decided that, as part of actions taken to cope with budget limitations in a number of its programs, the emphasis on training activities would be at the regional and area levels. Previously, APHIS headquarters had run the formal training courses for inspectors. The following table shows the reported staff days spent on formal animal welfare training during fiscal years 1981 through 1983 for the six area offices we reviewed.

| Area office | Total staff days charged to training for fiscal year | | | Staff days per inspector in fiscal year 1983 |
| --- | --- | --- | --- | --- |
| | 1981 | 1982 | 1983 | |
| California | 5.0 | 10.0 | 13.8 | 0.6 |
| Iowa | 30.9 | 53.0 | 2.5[a] | 0.2 |
| Kansas | 34.4 | 20.0 | 0 | 0 |
| Missouri | 24.5 | 43.3 | 0 | 0 |
| New York | 3.6 | 0 | 15.0 | 2.1 |
| Texas | 22.0 | 0 | 8.0 | 0.5 |

[a]The training time reported by the Iowa area office may be understated. An area office memorandum indicates that 6 staff days may have been spent on training. The area veterinarian-in-charge could not readily explain the discrepancy. If 6 days is the correct amount, the staff days per inspector would be 0.4.

Our work at the six area offices showed that 57 of the 73 inspectors for whom we obtained training information had attended formal animal welfare training courses, but we noted that a number of inspectors had never attended any animal welfare courses. For example, 9 of the 25 inspectors in California and 6 of the 17 inspectors in Texas had never attended any formal animal welfare training courses. Also, 43 of the inspectors who had attended formal training courses had not done so in recent years. For example, only 1 of the 17 inspectors in Kansas had attended any animal welfare courses since 1980, and none of the inspectors in Texas had attended any animal welfare courses since 1979.

The inspectors in all six offices generally received on-the-job training when they first started working on animal welfare and have also been provided with subsequent on-the-job training. In addition, five of the six area offices include discussions of animal welfare topics at periodic work conferences, although California had only held one such conference since 1981. The Texas area office holds work conferences but does not use them to provide training.

8