Civ. Action No. 06-930 (RMC)

EXHIBIT 44

UNITED STATES DEPARTMENT OF AGRICULTURE
FOOD SAFETY AND INSPECTION SERVICE
WASHINGTON, DC

| **FSIS DIRECTIVE** | 6900.2 Revision 1 | 11/25/03 |
|---|---|---|

Humane Handling and Slaughter of Livestock

**PART I –- GENERAL**

**I.    PURPOSE**

This directive informs inspection program personnel of the requirements, verification activities, and enforcement actions for ensuring that the handling and slaughter of livestock, including the slaughter of livestock by religious ritual methods, is humane. This directive explains how inspection program personnel should approach these activities.

**II.    CANCELLATION**

FSIS Directive 6900.2, dated 10/7/03

**III.    REASON FOR REISSUANCE**

FSIS is reissuing this directive to provide additional clarification to the instructions in Part V, Ritual Slaughter of Livestock.

**IV.    REFERENCES**

9 CFR parts 313 and 500, the Humane Methods of Slaughter Act  - 7 U.S.C. 1901, 1902, and 1906, and FSIS Directive 6900.1 – Humane Handling of Disabled Livestock.

**V.    BACKGROUND**

A.  The Humane Methods of Slaughter Act of 1978 (HMSA) (Section 1901, 1902 and 1906, Attachment 1) states that the slaughtering and handling of livestock are to be carried out only by humane methods.  In that Act, Congress determined (among other things) that the use of humane methods of handling and slaughtering livestock prevents needless suffering of animals and results in safer and better working conditions for employees in slaughter establishments.

B.  Once a vehicle carrying livestock enters an official slaughter establishment's premises, the vehicle is considered to be a part of that establishment's premises.  The animals within that vehicle are to be handled in accordance with 313.2.

| **DISTRIBUTION:** Inspection Offices; T/A Inspectors; Plant Mgt; T/A Plant Mgt; TRA; ABB; TSC; Import Offices | **OPI:** OPPD |
|---|---|

**PART II -- VERIFICATION OF THE LIVESTOCK PENS, DRIVEWAYS, and RAMPS**

    **A.  What are the regulations related to livestock pens, driveways and ramps?**

Section 313.1 states:
   *(a)  Livestock pens, driveways and ramps shall be maintained in good repair.  They shall be free from sharp or protruding objects which may, in the opinion of the inspector, cause injury or pain to the animals.  Loose boards, splintered or broken planking and unnecessary openings where the head, feet, or legs of an animal may be injured shall be repaired.*
   *(b)  Floors of livestock pens, ramps, and driveways shall be constructed and maintained so as to provide good footing for livestock.  Slip resistant or waffled floor surfaces, cleated ramps and the use of sand, as appropriate, during winter months are examples of acceptable construction and maintenance.*
   *(d)  Livestock pens and driveways shall be so arranged that sharp corners and direction reversal of driven animals are minimized.*

**NOTE**:  Verification of compliance with 9 CFR 313.1(c) is addressed in FSIS Directive 6900.1, Humane Handling of Disabled Livestock.

    **B.  How do inspection program personnel verify compliance with this regulation?**

   When verifying compliance with 9 CFR 313.1(a), (b), and (d), inspection program personnel should determine whether the pens, driveways, and ramps are designed and maintained to prevent injury or pain to the animals.  To do this, inspection program personnel need to seek answers to questions such as:

     1. Are pens free of loose boards or openings, so that the head, feet or legs of an animal will not be injured?

     2.  Are the floors of pens, ramps, and driveways constructed so that an animal is not likely to fall (e.g., cleated, waffled, use of sand)?

     3.  Are driveways arranged so that sharp turns or sudden reversals of direction are minimized, so that they are not likely to cause injury to the animals?

   These questions are examples and are not an all-inclusive list.

    **C.  What actions do inspection program personnel take if there is a noncompliance with 9 CFR 313.1?**

   If inspection program personnel observe a noncompliance with 9 CFR 313.1, they are to determine whether the situation does or will immediately lead to animal injury or inhumane treatment.  If the noncompliance is such that it will not immediately lead to injury (e.g., a few loose boards), inspection program personnel are to take action as set out in Part VI A.  If the noncompliance is such that an animal has been injured

(e.g., an animal's leg falls in between boards), inspection program personnel are to take action as set out in Part VI B.

**PART III – VERIFICATION OF HUMANE HANDLING OF LIVESTOCK**

    **A. What is the regulation related to handling of livestock?**

Section 313.2 states:
   *(a) Driving of livestock from the unloading ramps to the holding pens and from the holding pens to the stunning area shall be done with a minimum of excitement and discomfort to the animals. Livestock shall not be forced to move faster than a normal walking speed.*
   *(b) Electric prods, canvas slappers, or other implements employed to drive animals shall be used as little as possible in order to minimize excitement and injury. Any use of such implements which, in the opinion of the inspector, is excessive, is prohibited. Electrical prods attached to AC house current shall be reduced by a transformer to the lowest effective voltage not to exceed 50 volts AC.*
   *(c) Pipes, sharp or pointed objects, and other items which, in the opinion of the inspector, would cause injury or unnecessary pain to the animal shall not be used to drive livestock.*
   *(d) Disabled livestock and other animals unable to move. (Also refer to FSIS Directive 6900.1, Humane Handling of Disabled Livestock).*
    *(1) Disabled animals and other animals unable to move shall be separated from normal ambulatory animals and placed in the covered pen provided for in section 313.1(c).*
    *(2) The dragging of disabled animals and other animals unable to move, while conscious, is prohibited. Stunned animals may, however, be dragged.*
    *(3) Disabled animals and other animals unable to move may be moved, while conscious, on equipment suitable for such purposes; e.g., stone boats.*
   *(e) Animals shall have access to water in all holding pens and, if held longer than 24 hours, access to feed. There shall be sufficient room in the holding pen for animals held overnight to lie down.*
   *(f) Stunning methods approved in section 313.30 shall be effectively applied to animals prior to their being shackled, hoisted, thrown, cast or cut.*

    **B. How do inspection program personnel verify compliance with these regulations?**

    When verifying compliance with 9 CFR 313.2, inspection program personnel should determine whether the handling of livestock is being done with a minimum of excitement and discomfort to the animals. Inspection program personnel will verify the moving of livestock, the availability of water and the handling of disabled livestock in the establishment. To do this, inspection program personnel need to seek answers to questions such as:

    1. Are animals driven from the unloading ramps to the holding pens with a minimum of excitement and not at a running pace?

2. Are electric prods and other implements used as little as possible to move animals within the establishment?

3. Are animals driven by using an object that would not cause unnecessary pain (e.g., not using a sharp object or pipe)?

4. Are disabled animals separated from ambulatory animals and placed in a covered pen?

5. Do the animals have access to water?

6. Is there sufficient room in the holding pens for animals that are held over night?

The above questions are examples and are not an all-inclusive list.

**NOTE**: Verification of compliance with 9 CFR 313.2(d) that deals specifically with disabled livestock, is also addressed in FSIS Directive 6900.1, Humane Handling of Disabled Livestock.

**C. What actions do inspection program personnel take if there is a noncompliance with 9 CFR 313.2?**

If inspection program personnel observe a noncompliance with 9 CFR 313.2, they are to determine whether the situation does or will immediately lead to animal injury or inhumane treatment. If the noncompliance can be immediately remedied (e.g., providing water to penned animals), inspection program personnel are to take the action as set out in Part VI A 1 and 2. If an immediate remedy is not forthcoming (e.g., the establishment fails to provide water immediately after being notified that animals do not have water available), inspection program personnel are to take the action as set out in Part VI A 3. If the noncompliance is resulting in the injury or inhumane treatment of animals (e.g., the dragging of disabled animals), inspection program personnel are to take action as set out in Part VI B.

**PART IV – STUNNING METHODS**

Appropriate stunning methods are required for an establishment to be in compliance with the HMSA. When stunning is done correctly, animals feel no pain, are rendered instantly unconscious, and remain unconscious until slaughtered. There are four methods of stunning approved for livestock. A summary of these approved stunning methods appear below (refer to 9 CFR sections 313.5, 313.15, 313.16 and 313.30).

**A. What are the general regulatory requirements related to approved stunning methods?**

4

**Chemical; carbon dioxide**

Regulatory requirements for the use of carbon dioxide as a humane method of slaughter are specified in section 313.5 and include, among other things, the following:

1) Carbon dioxide gas may be used to slaughter and handle sheep, calves and swine.

2) The carbon dioxide gas shall be administered in a chamber so as to produce surgical anesthesia (a state where an animal feels no painful sensation) before the animal is shackled, hoisted, thrown, cast, or cut. Animals shall be exposed to the carbon dioxide gas in a way that will accomplish the anesthesia quickly and calmly.
3) Gas concentrations and exposure times shall be graphically recorded throughout each day's operation.
4) It is necessary that the operator be skilled, attentive, and aware of his or her responsibility.

**Mechanical; captive bolt**

Regulatory requirements for the use of captive bolt stunners as a humane method of slaughter are specified in section 313.15 and include, among other things, the following:

1) Captive bolt stunners may be used to slaughter and handle sheep, swine, goats, calves, cattle, horses, mules, and other equines.
2) The captive bolt stunners shall be applied to livestock so as to produce immediate unconsciousness in the animals before they are shackled, hoisted, thrown, cast, or cut.
3) The stunning operation is an exacting procedure and requires a well-trained and experienced operator who must use the correct detonating charge with regard to kind, breed, size, age, and sex of the animal to produce the desired results.
4) Stunning instruments must be maintained in good repair.

**Mechanical; gunshot**

Regulatory requirements for the use of gunshot as a humane method of slaughter are specified in section 313.16 and include, among other things, the following:

1) Shooting by firearms may be used to slaughter and handle cattle, calves, sheep, swine, goats, horses, mules, and other equines.
2) A single shot delivery of a bullet or projectile into the animal is to produce immediate unconsciousness in the animal before it is shackled, hoisted, thrown, cast or cut.
3) Firearms must be maintained in good repair.
4) The shooting operation is an exacting procedure and requires a well-trained and experienced operator who must be able to accurately direct the projectile to produce immediate unconsciousness.
5) The operator must use the correct caliber firearm, powder charge and type of ammunition to produce instant unconsciousness in the animal.

**Electrical; stunning or slaughtering with electric current**

Regulatory requirements for the use of electric current as a humane method of slaughter are specified in section 313.30 and include, among other things, the following:

1) Electric current may be used to slaughter and handle swine, sheep, calves, cattle, and goats.
2) The animal shall be exposed to the electric current in a way that will accomplish surgical anesthesia (a state where an animal feels no painful sensation) quickly and effectively before they are shackled, hoisted, thrown, cast, or cut.
3) It is necessary that the operator of electric current application equipment be skilled, attentive, and aware of his or her responsibility.
4) Suitable timing, voltage and current control devices shall be used to ensure that each animal receives the necessary electrical charge to produce immediate unconsciousness.

**B.  How do inspection program personnel verify compliance with these regulations?**

When verifying compliance with 9 CFR 313.5, 313.15, 313.16, and 313.30, inspection program personnel should assess the stunning method used for its effectiveness in rendering animals immediately unconscious and verify that animals are being properly stunned at the knocking box before hoisting.  To do this, inspection program personnel need to seek answers to questions such as:

1.  During stunning operations, is the establishment consistently rendering animals unconscious with a single application of the stunning methodology?

2.  Is stunning equipment in good repair?

3.  Are carbon dioxide gas concentrations graphically recorded throughout each day's stunning operation so that the correct amount of gas is used to adequately anesthetize an animal?

4. Is the captive bolt stunner accurately placed so that after it is applied the animal is immediately unconscious?

5.  Is the correct caliber firearm being used to produce quick and complete unconsciousness in an animal?

6.  Is the proper voltage of electric current being used so that the animal is quickly rendered unconscious?

**NOTE**:  The above questions are examples and are not an all-inclusive list.

**C.  What actions do inspection program personnel take if there is a noncompliance with 9 CFR 313.5, 313.15, 313.16, or 313.30?**

If inspection program personnel observe a noncompliance with 9 CFR 313.5, 313.15, 313.16, or 313.30, they are to determine whether the situation does or will immediately

6

lead to animal injury or inhumane treatment. If the noncompliance is such that animals will not be injured or treated inhumanely (e.g., the gas concentration was not graphically recorded, but the establishment showed that the proper concentration was administered), inspection program personnel are to take an action as set out in Part VI A. If the noncompliance is resulting in the injury or inhumane treatment of animals (e.g., an animal is not properly rendered unconscious) inspection program personnel are to take action as set out in Part VI B.

**PART V -- RITUAL SLAUGHTER OF LIVESTOCK**

**A. General Requirement**

Section 1902 (b) of the Humane Methods of Slaughter Act of 1978 provides that "slaughtering in accordance with the ritual requirements of the Jewish faith or any other religious faith that prescribes a method of slaughter whereby the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument and handling in connection with such slaughtering" is humane. Section 1906 of the Act further provides that, "Nothing in this chapter shall be construed to prohibit, abridge, or in any way hinder the religious freedom of any person or group. Notwithstanding any other provision of this chapter, in order to protect freedom of religion, ritual slaughter and the handling or other preparation of livestock for ritual slaughter are exempted from the terms of this chapter. For the purposes of this section the term 'ritual slaughter' means slaughter in accordance with section 1902(b) of this title."

**B. What are the responsibilities of inspection program personnel in establishments where there is ritual slaughter?**

1. In an establishment that performs ritual slaughter, inspection program personnel are to request the plant manager to inform them about what type of ritual slaughter (e.g., Kosher, Halal) will be performed, when it will be performed, and who will perform the ritual slaughter.

2. Inspection program personnel are to verify that the humane handling of animals prior to preparation of the animal for ritual slaughter is consistent with parts II and III of this directive, with the exception of the discussion of stunning (9 CFR 313.2(f)) in part III of this directive. Examples of verification activities may include confirming the availability of water, checking the condition of pens and ramps, and verifying that there is no excessive use of electric prods.

3. Inspection program personnel are to verify that after the ritual slaughter cut and any additional cut to facilitate bleeding, no dressing procedure (e.g., head skinning, leg removal, ear removal, horn removal, opening hide patterns), is performed until the animal is insensible.

7

**C. What actions do inspection program personnel take if they have concerns with humane handling prior to the handling and preparation of the animals for ritual slaughter or concerns with dressing procedures performed after ritual slaughter prior to the animal becoming insensible?**

   1.  Inspection program personnel are not to interfere in any manner with the preparation of the animal for ritual slaughter, including the positioning of the animal, or the ritual slaughter cut and any additional cut to facilitate bleeding.

   2.  If inspection program personnel have concerns while verifying part V. paragraph B., they are to call the DO through supervisory channels.

**PART VI – ENFORCEMENT AND DOCUMENTATION**

   **A.  What do inspection program personnel do when they have determined that a noncompliance with the humane slaughter and handling requirements has occurred that is not immediately causing injury or inhumane treatment of animals?**

   1.  Inspection program personnel are to document the noncompliance on an FSIS Form 5400-4, Noncompliance Record (NR), under the Inspection System Procedure (ISP) code 04C02 using the "Protocol" trend indicator.  Inspection program personnel are to specify the regulation or statutory provision that pertains to the incident, provide a concise description of the noncompliance and provide any other evidence that supports the determination that a noncompliance has occurred.

   2.  Inspection program personnel are to verify that the establishment takes the necessary immediate and further preventive actions.

   3.  If an establishment fails to adequately respond to an NR or fails to take its immediate and further preventive actions, inspection program personnel are to take a control action (i.e., apply a U.S. Reject Tag) as set out in 9 CFR 500.2 (a)(4), *inhumane handling or slaughter of livestock*.  The control action will remain in place until the establishment implements the appropriate immediate and further preventive actions that ensure compliance with the appropriate section of 9 CFR part 313.

   **B.  What do inspection program personnel do when they have determined that a noncompliance with the humane slaughter and handling requirements has occurred and animals are being injured or treated inhumanely?**

   1.  Inspection program personnel are to document the noncompliance on an NR, under the ISP code 04C02 using the "Protocol" trend indicator.  Inspection program personnel are to specify the regulation or statutory provision that pertains to the incident, provide a concise description of the noncompliance and provide any other evidence that supports the determination that a noncompliance has occurred.

FSIS DIRECTIVE 6900.2
REVISION 1

      2.  Inspection program personnel are to take a control action (i.e., apply a tag) as set out in 9 CFR 500.2 (a)(4), *inhumane handling or slaughter of livestock*. The control action will remain in place until the establishment implements the appropriate immediate and further preventive actions that ensure compliance with the appropriate section of 9 CFR part 313.

      **C.  How do inspection program personnel determine whether there is a trend of a noncompliance with the humane slaughter and handling requirements?**

To determine whether a noncompliance trend exists, inspection program personnel will need to decide whether they can link NRs. Inspection program personnel should only link NRs when the noncompliances are from the same cause.

To make a determination as to whether a trend exists, inspection program personnel are to seek answer to the following questions:

      1.  How much time has lapsed since the previous NR was written?

      2.  Was this noncompliance from the same cause as the previous NR?

      3.  Were the establishment's further planned actions implemented?

      4.  Were the establishment's further planned actions effective in reducing the frequency of these noncompliances?

      5.  Is the establishment implementing additional planned actions that reduce the possibility of recurrence?

Inspection program personnel should be discussing any linkages with plant management during the weekly meetings. Inspection program personnel should also include in Block 10 of the NR that these discussions were held. Inspection program personnel should also include a statement in Block 10 of the NR stating that continued failure to meet regulatory requirements can lead to the enforcement actions described in 9 CFR 500.3(b).

Inspection program personnel should continue to link NRs together that derive from the same or a related cause until he or she determines that an enforcement action is necessary to bring the establishment into compliance with the regulations.

When inspection program personnel determine that an enforcement action (i.e., suspension as described in 9 CFR 500.3(b)) is necessary, they should contact the District Office (DO) and provide support for this determination.

The DO will determine whether inspection should be suspended as set out in 9 CFR 500.3(b). As provided in 9 CFR 500.3(b), FSIS may impose a suspension without providing the establishment prior notification if the establishment is handling or slaughtering animals inhumanely.

**D. When may the Inspector-in-Charge (IIC) immediately suspend inspection because the establishment is handling or slaughtering animal inhumanely?**

If there is an egregious situation of inhumane handling or slaughter, the IIC may immediately suspend inspection in accordance with 9 CFR 500.3(b) of the regulations. The IIC verbally notifies plant management of the suspension. In such situations, the IIC is to immediately notify the DO for prompt documentation of the suspension action.

**PART VII – INFORMATION FOR THE DISTRICT VETERINARY MEDICAL SPECIALISTS (DVMS)**

**What do inspection program personnel provide to the DO to document noncompliance findings with the humane handling and slaughter requirements?**

When noncompliances occur, inspection program personnel are to send copies of the NRs to the DVMS (or to the Deputy District Manager if there is no DVMS in a District). These NRs should be kept on file in the DO. When necessary, the DVMS or the Deputy District Managers will follow-up on issues of concern and will correlate resolutions.

*/s/ Philip S. Derfler*

Assistant Administrator
Office of Policy and Program Development

FSIS DIRECTIVE 6900.2
REVISION 1
Attachment 1

**Humane Methods of Slaughter Act of 1978**.  (7 U.S.C. 1901 et seq.)

Sec. 1901. - Findings and declaration of policy

The Congress finds that the use of humane methods in the slaughter of livestock prevents needless suffering; results in safer and better working conditions for persons engaged in the slaughtering industry; brings about improvement of products and economies in slaughtering operations; and produces other benefits for producers, processors, and consumers which tend to expedite an orderly flow of livestock and livestock products in interstate and foreign commerce. It is therefore declared to be the policy of the United States that the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods.

Sec. 1902. - Humane methods

No method of slaughtering or handling in connection with slaughtering shall be deemed to comply with the public policy of the United States unless it is humane. Either of the following two methods of slaughtering and handling are hereby found to be humane:
(a) in the case of cattle, calves, horses, mules, sheep, swine, and other livestock, all animals are rendered insensible to pain by a single blow or gunshot or an electrical, chemical or other means that is rapid and effective, before being shackled, hoisted, thrown, cast, or cut; or
(b) by slaughtering in accordance with the ritual requirements of the Jewish faith or any other religious faith that prescribes a method of slaughter whereby the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument and handling in connection with such slaughtering.

Section 1906 – Exemption of ritual slaughter

Nothing in this chapter (Humane Methods of Slaughter Act of 1978 – Title 7 of the U.S. Code, Chapter 48) shall be construed to prohibit, abridge, or in any way hinder the religious freedom of any person or group.  Not withstanding any other provision of this chapter, in order to protect freedom of religion, ritual slaughter and the handling or other preparation of livestock for ritual slaughter are exempted from the terms of this chapter. For the purposes of this section the term "ritual slaughter" means slaughter in accordance with section 1902(b) of this title.